**Thomas J. PASKVAN, Jr., Appellant,**

v.

**Drago MESICH et al., Appellees.**

**Drago MESICH et al., Appellants,**

v.

**Paul DRAZENOVICH, Appellee.**

**Nos. 913, 921.**

Supreme Court of Alaska.

June 4, 1969.

Millard F. Ingraham, Fairbanks, for Thomas J. Paskvan, Jr.

Mike Stepovich, Fairbanks, Peter A. Schwabe, Portland, Or., for Drago Mesich, and another.

Sherman A. Noyes, Fairbanks, for Paul Drazenovich.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

DIMOND, Justice.

This is a dispute among three parties over a dead man's property.

Thomas Paskvan, Jr. claims the property as sole beneficiary under a will executed by decedent, Pete Mesich, on September 18, 1946. The probate master, after a hearing, found that this will was a product of undue influence exercised by Paskvan and was not entitled to probate, a finding which was concurred in by the superior court on appeal from the master's findings. Paskvan has appealed to this court from the superior court's order rejecting the 1946 will.

Paul Drazenovich claims the property as sole beneficiary under a will executed by decedent on August 25, 1952. The probate master found that decedent was incompetent at the time of the execution of this will and that it was not entitled to probate as decedent's last will and testament. The master's findings were rejected by the superior court. After a hearing at which evidence was introduced, the superior court found that decedent was competent to make the 1952 will, that there was no proof of undue influence in connection with its execution, and that it was entitled to be admitted to probate.

Certain relatives of decedent, consisting of five nieces and two grandnephews, claim the property as decedent's heirs, such claim being based on the contention that neither of the two wills was valid and that decedent died intestate. The heirs, Drago Mesich, et al, have appealed from the superior court's judgment recognizing as valid and admitting to probate the will of August 25, 1952.

*The Paskvan Will.*

The probate master found that a confidential relationship existed between Paskvan and Mesich, that the evidence raised an inference that Mesich's will of September 18, 1946 leaving all his property to Paskvan was a product of undue influence exercised by the latter, and that Paskvan had not produced evidence sufficient to overcome that inference. The superior court accepted and adopted these findings of the master.[1]

1. Civ.R. 53(d)(2) provides in part:
   In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous.

■ Since the findings of a master, to the extent that the superior court adopts them, are considered as findings of the court,[2] Civil Rule 52(a) applies and we may not set aside such findings unless we determine them to be clearly erroneous.[3] Clear error will not be found unless we are convinced on the whole record that a mistake has been committed.[4]

■ A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence.[5]

Mesich was the owner of the Arctic Hotel in Fairbanks. In the spring of 1946 he and Paskvan formed a partnership for the operation of the hotel, with Paskvan to get 50 percent of the revenue from the hotel. There is no evidence that Paskvan invested any money in this enterprise. On the same day the will was executed September 18, 1946, Mesich executed a general power of attorney in favor of Paskvan. Paskvan testified that the purpose of the power of attorney was to enable him to handle Mesich's affairs as to the Arctic Hotel—to "act for him" and "to speak for him and everything". Paskvan was the managing partner.

Also in the spring of 1946 Paskvan and Mesich decided to develop some property on Second Avenue in Fairbanks where they built a combination restaurant and bar called the Elbow Room. Paskvan invested $10,000 in the venture which he had obtained as a loan from the Veteran's Administration. Mesich worked on the project and invested several thousand dollars in it. Mesich's contribution came in part from his share of the revenues from the operation of the Arctic Hotel.

Mesich's will, leaving all his estate to Paskvan, was executed in September 1946. Paskvan testified that the will was executed "so that we could go ahead and develop this property [the Elbow Room property on Second Avenue] so that there would be * * * some basis for starting the the [sic] business partnership." The property belonged to Mesich. Paskvan used the will as evidence of his interest in the property when he attempted to secure a veteran's loan with respect to the property, but he was told that the will was not the answer to being able to borrow money. He was told that he had to be a part owner of the property in order to borrow money on it. Paskvan then went to Mesich and had him convey to Paskvan a half interest in the property by deed. After this conveyance, Paskvan obtained a veteran's loan on the property.

■ In the light of these facts we cannot say that the probate master was mistaken in finding that a confidential relationship existed between Mesich and Paskvan. Mesich's actions in making Paskvan the managing partner in the Arctic Hotel enterprise, in giving Paskvan his power of attorney so that Paskvan could act and speak for Mesich, in executing his will in favor of Paskvan so that there would be a basis for their partnership venture, and in conveying to Paskvan a one-half interest in the Elbow Room property shows quite clearly that Mesich trusted Paskvan and reposed confidence in him—that he relied upon Paskvan to act in Mesich's best interests in handling his affairs.

■ The remaining question is whether the probate master was clearly mistaken

---

2. Civ.R. 52(a) provides in part:
   The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court.

3. Civ.R. 52(a) provides in part:
   Findings of fact shall not be set aside unless clearly erroneous * * *.
   2B Barron & Holtzoff, Federal Practice and Procedure §§ 1136, 1170, at 555, 607 (1961).

4. Knox v. Pickles, 451 P.2d 347, 349 (Alaska 1969).

5. Twelve Hundred "L" St. Corp. v. Inlet Co., 438 P.2d 708, 709 (Alaska 1968); Swenson v. Wintercorn, 92 Ill.App.2d 88, 234 N.E.2d 91, 97 (1968).

in finding that, because of the confidential relationship and other factors, the will was a product of undue influence exercised by Paskvan. The initial burden is on the contestant of a will to establish undue influence, and the existence of a confidential relationship alone does not suffice to raise a presumption that undue influence was present.[6] But when the principal or sole beneficiary under a will, who had a confidential relationship with the testator, participated in the drafting of the will, then a presumption of undue influence arises. It requires the beneficiary to come forward with a satisfactory explanation for his actions. He must show that he did not take advantage of the confidential relationship in influencing the testator to execute the will in his favor.[7]

Such a presumption arises in this case. A fiduciary or confidential relationship existed between Mesich and Paskvan, and the evidence shows that Paskvan participated in the execution of the will. Paskvan testified that the will was prepared by an attorney, that it took about three days conferring with the attorney to get the will prepared, that at several meetings in the attorney's office Paskvan was present with Mesich, and that Paskvan was present when the will was executed. Paskvan indicated his interest in having the will made at one point by saying, in answer to the question of why he had gone to the attorney's office with Mesich: "Well, Pete [Mesich] was the one that uh wanted to draw this thing up, because *we had planned on developing this property* * * *." [Emphasis added.] At another point in his testimony Paskvan said:

> Well, I suppose we uh—I know we both went up there and uh *told him exactly what uh we wanted,* and Mr. Hurley took his notes down in—in longhand * * *. [Emphasis added.]

The presumption that undue influence existed is strengthened by other factors. Mesich was a Croatian who emigrated to the United States in 1902. At the time he executed the Paskvan will in 1946 he was 65 years old. He was unable to read or write the English language and spoke English with a heavy Slavic accent. In 1942 he was attacked by an unknown assailant who hit him on the head with a heavy instrument, inflicting serious wounds. He was required to be hospitalized for 42 days during much of which time he was unconscious or semiconscious. There was considerable testimony that after this blow to his head Mesich deteriorated mentally, had difficulty communicating with people, did not seem aware of what was going on around him, and was not competent to handle his business affairs.

Paskvan did not carry his burden of overcoming the presumption of undue influence. It is true that he testified that Mesich had made the will in his favor as a reward for Paskvan's willingness to help Mesich—because Mesich was happy with the way Paskvan did things and thought Paskvan was worthy of his consideration. But this was not enough. The presumption of undue influence was a strong one because of the age and mental condition of Mesich, the fiduciary or confidential relationship that existed between Mesich and Paskvan, Paskvan's opportunity to exercise undue influence because of his handling of Mesich's affairs as the "managing partner", the fact that Paskvan appeared to be the dominant party in their relationship, Paskvan's participation in the procurement of the will, the fact that Paskvan became the sole beneficiary under the will,[8] Paskvan's possession of the will after its execution, and the fact that the will seemed to have been executed so that Paskvan could utilize it in order to obtain a real estate loan.

6. Yribar v. Fitzpatrick, 91 Idaho 105, 416 P.2d 164, 166 (1966).

7. Cline v. Larson, 234 Or. 384, 383 P.2d 74, 85 (1963); Hummer v. Betenbough, 75 N.M. 274, 404 P.2d 110, 115 (1965).

8. *See* Dean v. Jordan, 194 Wash. 661, 79 P.2d 331, 336 (1938).

■ The totality of these circumstances points to a situation where Paskvan took advantage of a trust and confidence that Mesich had in him in order to acquire all of Mesich's property upon his death. Paskvan had no satisfactory explanation for his actions in this regard. He did not show that in regard to the confidential relationship between him and Mesich he had acted with entire good faith and with due regard to the interests of Mesich. In the absence of such a showing, the presumption of undue influence prevails, and therefore the probate master and the superior court were not clearly erroneous in finding that the 1946 will was a product of undue influence.

The only other time we have had occasion to consider the subject of undue influence as it pertains to the execution of a will was in 1962 when we decided the case of In re Estate of Kraft.[9] We said there:

> Appellant has failed to sustain her burden of proving that by reason of influence exercised by another, the testator was virtually compelled to make a will which he would not have made had he been left to the free exercise of his own judgment and wishes.

In that case we approached the problem from the standpoint of the testator's freedom of will. We thought in terms of coercion and duress which would act as a dominating power over the mind and act of a testator, because in that case it had been argued that the testator had been induced to execute a last will and testament which in reality was not his will but another person's will substituted for that of the testator. Here we are not concerned with whether there have been acts to overbear the will of a testator. Unlike the situation in *Kraft,* we are concerned here with whether the beneficiary under a will has by his conduct and his relationship with the testator taken advantage of the latter by means which reasonable and moral men would regard as improper, in

order to obtain some benefit or profit.[10] If he has, the will is a product of undue influence even in the absence of coercion and duress acting as a dominating power over the mind and act of the testator.

### The Drazenovich Will.

On August 25, 1952 Mesich executed a will leaving all his property to Paul Drazenovich. The probate master found that Mesich was not competent to make this will. He based this holding on what he determined to be a presumption of incompetency arising from the appointment of a guardian of the estate and property of Mesich on April 9, 1951, which presumption the probate master held was not rebutted. The superior court rejected the master's findings and heard testimony regarding Mesich's competency to execute the 1952 will. The court found that at the time of execution Mesich knew the nature and extent of his property, was aware of the natural objects of his bounty, knew that he was making a will, and was aware of the nature and consequences of his act. The court also found that the will was executed voluntarily and was not the product of undue influence, and that it was entitled to probate.

■ In the case of In re Estate of Kraft[11] we spoke on the subject of testamentary capacity as follows:

> Disease, great weakness, the use of alcohol and drugs, and approaching death do not alone render a testator incompetent to make a will. The question is always whether, in spite of these things, he had sufficient mental capacity to understand the nature and extent of his property, the natural or proper objects of his bounty, and the nature of his testamentary act.

We also said in that case that the trial court's decision as to testamentary capacity would not be reversed unless we found it

9. 374 P.2d 413, 417 (Alaska 1962).

10. In re Estate of Reddaway, 214 Or. 410, 329 P.2d 886, 890 (1958).

11. Id. at 415–416.

to be clearly erroneous.[12]   That is the question here—whether the superior court's finding that Mesich possessed testamentary capacity when he executed the 1952 will was or was not clearly erroneous.   In order to make this determination, we must consider the evidence that touches upon the testamentary capacity of Mesich in 1952.

Mrs. Dorothy Clark, one of the two subscribing witnesses to the 1952 will, testified that she never had any difficulty communicating with Mesich before, at or after the witnessing of the will, that Mesich appeared to know what he was doing, and that she never had any reason to think that Mesich was not of sound mind.   On the other hand, when Mrs. Clark was asked whether she could say that she had any reason to believe that Mesich was of sound mind in her limited relations with him, she answered: "Well, I don't know why I should say whether he's sane or insane. I mean, who am I to judge?"   Mrs. Clark described her relationship with Mesich as a casual acquaintance.

The other subscribing witness to the will, Charles Burtchin, who was then Mrs. Clark's husband, did not testify in person. In answer to interrogatories he said: "The testator, Pete Mesich, as far as my recollection goes was quite normal and appeared to know what he was doing in signing the will."   Drazenovich owned the property where Mrs. Clark and Burtchin were living at the time.

Other witnesses who appeared on behalf of Drazenovich, most of whom had had business contacts with Mesich from time to time, testified varyingly that Mesich was "probably as normal as most of us", that there was no trouble in understanding Mesich and that he appeared to be rational, that it was no more difficult to understand Mesich after 1942, the year he suffered the blow to his head, than it was before that year, that Mesich seemed rational, not abnormal and capable of carrying on his business, that there was no noticeable change in his personality, that in conversa-

tions with Mesich he appeared to understand what the other person was talking about, that Mesich engaged in conversations with people and recognized them, and that Mesich never performed any antisocial acts.

Of these witnesses for Drazenovich, eight in number, one testified that he had "very limited contact" with Mesich and that his memories were "quite vague" about the business relationships he had had with Mesich.   Another testified that she did not recall Mesich very clearly, and that her relationship with Mesich ended in 1948— four years prior to the execution of the Drazenovich will.   Another testified that he never saw Mesich after 1951.   Another testified that she saw Mesich only once or twice a year and that the conversations with him were very casual.   Another witness admitted that her acquaintance with Mesich was a very casual one, and another said that she really could not have a conversation with Mesich because of his broken English.

Dr. Jack Petajan, a neurologist, testified on behalf of Drazenovich.   He had not examined Mesich.   But he testified, on the basis of certain assumptions posed in a hypothetical question, that recent memory loss alone would not be a sufficient basis to say that judgment was impaired, that he thought that Mesich would know his relatives and whom he wished to favor, that Mesich could probably have remembered what property he had owned for a long time prior to his memory loss, and that Mesich probably would have had at least an understanding that a will conveyed away property.

However, Dr. Petajan did not have an opinion to a reasonable medical certainty as to whether Mesich had been competent at the time he executed the will.   In addition, it is questionable as to whether all of the assumptions in the hypothetical question were supported by the evidence.   For example, one of the assumptions made in the hypothetical question was that in 1951 a

12. Id. at 416.

guardian had been appointed for Mesich on the ground that he could not read and write the English language. There is nothing in the record to show whether a guardian had been appointed for that reason or because Mesich simply was not competent to handle his own affairs. Another assumption was that Mesich had properly executed the 1952 will "before witnesses of his own choice." The evidence shows that the witnesses to the execution of his will were chosen by Drazenovich. Another assumption was that Mesich had had no record of unusual social responses or an unsteady course of behavior. There was evidence, which we shall refer to in more detail, from witnesses who appeared on behalf of Mesich's heirs who were contesting the will, that Mesich's course of behavior may well have been unsteady and his social responses unusual. Finally, although Dr. Petajan testified that Mesich would have been able to remember property he had owned for a long time prior to his memory loss, he probably would not be able to give a detailed account of property he had acquired recently after the memory loss.

There was other evidence relating to Mesich's competency to make the 1952 will. Blazo Bigovich was appointed guardian of Mesich's estate in 1951. Bigovich testified that Mesich could not talk about any business matters, that he "didn't understand" even when Bigovich spoke to Mesich in his own Slavic language, that Mesich did not know what property he had "deeded away", that "he would sign his own death certificate, he didn't know any different", that Bigovich tried to explain business matters to Mesich but he could not figure out how things had happened, that Mesich seemed to have very little understanding about things if any, that during a law suit where Mesich was involved "he didn't know what was happening any more than the man in the moon", and that this was Mesich's condition from the time Bigovich was appointed his guardian until about 1953 when Mesich had a stroke.

A Fairbanks attorney, Warren Taylor, had done legal work for Mesich from 1945 up to the 1950's. Taylor testified that he never could get a lucid story out of Mesich at an interview or on the witness stand in court, that during most of the time he knew Mesich his mind was so confused that he could not grasp the significance of questions even when put to him in his native language, and that in a law suit involving some of Mesich's property, Mesich was almost of no help in determining how much property he owned.

Andrew Miscovich testified that after the 1942 blow to Mesich's head, he could not remember present things, could not carry on a conversation, was unable to carry on his business, and was easily influenced. However, Miscovich on cross-examination stated that his conclusions about Mesich being easily influenced were based on things he had been told. In addition, Miscovich said that he had only seen Mesich during the winters about once a month.

George Bojanich testified that he first met Mesich in 1912 and maintained contact until 1915, and then did not renew the acquaintance again until 1941. He said that in 1945 he was called to be an interpreter in a law suit where Mesich was the defendant. Bojanich attempted to speak Slav to Mesich but was unable to even make Mesich understand the questions. This witness was not cross-examined.

Arthur Nerland testified that he knew Mesich because he supplied paint and other materials for him. He described Mesich as being a quiet kind of man prior to 1942. He said that after 1942 Mesich became even more quiet, impossible to communicate with, and he seemed to get worse over the years. Nerland testified that he did not think that Mesich was competent to handle his business affairs, and based his testimony on seeing Mesich about once a month over the years.

Everett Russell testified that he first met Mesich in 1937, saw him until 1941, and that after he had come back from the service in 1947 he saw Mesich occasionally until 1951. Russell said that after 1947 Mesich appeared irrational, that he did not recognize Russell, and that Russell

had been unable to conduct a conversation with Mesich. Russell also testified that in May or June of 1952 he saw Mesich six or eight times, and that Mesich was not aware of what was transpiring in the conversations around him. Russell also said that Mesich would always say "hello" if anyone else said "hello", but in Russell's opinion Mesich did not recognize anybody.

John Butrovich testified that he first met Mesich in 1941. He said that after the 1942 blow to Mesich's head he slowed down and that he shuffled around after that time. Butrovich said that he was unable to communicate with Mesich after he had suffered the blow to his head and he described Mesich as a "vegetable". Butrovich did not feel that Mesich was competent to handle his business after 1942. Finally Butrovich testified that he felt that Mesich did not know what was going on when he spoke to him in English after that time. The cross-examination of Butrovich was very brief.

Robert Lavery first met Mesich in the late 1930's when Mesich came into his grocery and meat market. Lavery testified that after 1942 he did not think that Mesich recognized anybody, and that he just said "hello", "hi", or made a grunting sound. Lavery did not think that Mesich was capable of handling his business affairs after 1942. He said that he made many attempts to engage Mesich in conversation from the period 1943 to 1954 but was unable to do so.

Louis Krize said that he first met Mesich in 1940 and that at that time Mesich was asked many questions which he handled very well. Krize contacted Mesich again in 1943 and described him then as changed, unable to carry on a conversation, and unable to recognize Krize. Krize stressed the fact that from 1940 to 1943 the mental condition of Mesich continued to get worse. Krize was asked only one question on cross-examination.

Dr. Arthur Schaible treated Mesich for the 1942 blow to his head. Dr. Schaible described Mesich's injury and condition. He said that he had opportunities to observe Mesich over a 10 year period from 1942 to 1953, and that he thought that Mesich's mental condition deteriorated during that time. He noticed disorientation and lapse of memory at times. It was Dr. Schaible's impression that Mesich was incompetent and that he would have a hard time taking care of his daily affairs. He said that by "certain standards" Mesich was not mentally competent.

Dr. Paul Haggland also treated Mesich for the 1942 injury. Dr. Haggland said he saw Mesich again in 1951 when he was brought in to have his competency determined. The doctor read into evidence the report he made at the time. In this report he stated that Mesich could not supply him with a satisfactory history of himself, that he had a definite pathology in his brain resulting from the 1942 injury to his head, and that his memory for old events was good but for recent events was poor. Dr. Haggland testified that it was his belief at the time he examined Mesich that he should have a guardian.

Paul Drazenovich, the proponent of and beneficiary under the 1952 will, testified at the master's hearing but not at the hearing held by the superior court. On the issue of testamentary capacity Drazenovich said that Mesich knew what he was doing when he executed the will, that Mesich was "all right in [the] mind", that there was never a time when Mesich did not recognize Drazenovich, that Mesich's "[m]ind was perfect", and that when he and Mesich went to see an attorney to have the will drawn up Mesich did most of the talking.

Drazenovich's testimony is of questionable value. Under cross-examination it was brought out that in 1953 Drazenovich had appeared as a witness in the suit brought in the Territorial District Court by Mesich, through his guardian, against the father of Thomas Paskvan, Jr. Drazenovich had testified as a witness for the plaintiff, Mesich. It is apparent from

the following excerpts from Drazeno-vich's 1953 testimony in the district court that he did not at that time believe that Mesich was mentally competent. He was asked for his opinion of Mesich's condition after he had suffered the blow to his head in 1942:

Q. How was Pete's condition after he got out of the hospital? How has it been since then?

A. Sometimes he don't hardly recognize me. Sometimes he comes to see me at my cabin and sometimes when I go to see him in the cabin he said, "Get out." I say, "What is the matter, Pete?" Then he comes and starts kissing me. "I am sorry," he said. "I thought it was somebody else." He does that right along, so far as I know.

Q. How does he talk?

A. Talk, sometimes tells what was happening most in childhood. He can stay all night telling me the same story over and over, but whatever is happening now he can tell me nothing.

Q. Do you know whether he is mentally competent?

A. I know he isn't.

Q. You know he isn't?

A. Sure.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Did you see Pete in the summer or fall of 1949?

A. I seen him, sure.

Q. Did he know what he was talking about then? Did he act rationally in 1949?

A. He didn't act right no time since he got hurt. So far as I know, he didn't act right.

Q. Didn't you say sometimes his mind is clear and sometimes it isn't? Isn't that the way it is?

A. No, so far as I can see I would ask him something and he can't remember nothing and then he tries to tell me old story over and over what happened in childhood.

Q. Don't ramble. Isn't it true that sometimes his mind is working all right and sometimes it isn't?

A. Not very much of the time.

Q. Not very much?

A. So far as I can see, no. I feel so because I know him pretty well, before he talk nice to me, advice and everything, but now it is different entirely.

Q. He give you advice?

A. Before he got hurt he gave me advice but now he doesn't know nothing &ast; &ast; &ast;.

In that case the district court made a specific finding that at all times since the 1942 injury to Mesich's head he was mentally incompetent to attend to his business affairs.[13]

█ Finally, on the issue of testamentary capacity, there was the appointment of a guardian for Mesich in 1951. Since the proceedings relating to the appointment of the guardian were not included in the record on appeal, we do not know specifically on what basis the guardian was appointed. But we do know, from the statute relating to the appointment of guardians, that at least it must have been found that Mesich was "incapable of conducting his affairs."[14] We recognize the rule that incompetency to make a will is not necessarily established by the fact that one has been adjudged an incompetent in

13. The district court entered judgment in favor of Mesich and against Paskvan, Sr. which judgment was affirmed on appeal. Paskvan v. Mesich, 227 F.2d 646, 16 Alaska 1, (9th Cir. 1955).

14. AS 20.05.080 provides:
    The court may appoint a guardian to take care, custody, and management of the estate of an insane person and any other person who is incapable of conducting his affairs and maintaining his family and the education of his children.

a guardianship proceeding.[15] But this fact is evidence to be considered, along with other evidence, on the issue of testamentary capacity.[16]

As to the burden of proof on testamentary capacity there is a divergence of authority. Some courts hold that the proponent of the will has the burden of establishing that the testator possessed testamentary capacity at the time he executed his will.[17] Other courts, and apparently the majority, hold that the contestant of a will has the burden of showing lack of testamentary capacity.[18] We adopt this latter view.

Along with the petition for probate of the 1952 will Drazenovich filed the affidavit of Mrs. Clark, one of the subscribing witnesses to the will. This witness stated under oath that the will was signed by Mesich in her presence and the presence of the other subscribing witness, that Mesich then declared that the instrument was his last will and testament, and that at the time of execution of the will Mesich was of sound and disposing mind and was not acting under duress, menace, fraud, undue influence or misrepresentation. This was evidence that established a prima facie case of testamentary capacity; the burden was then cast upon the contestants of the will to show that testamentary capacity was lacking.[19] The question here is whether Mesich's heirs, as contestants of the 1952 will, met that burden.

Most of the witnesses testifying both for and against testamentary capacity, who were seen and heard by the superior court, had only casual contacts with Mesich and had not been associated with him on any sustained basis. If the testimony of these witnesses were all that had to be considered, we would not reverse the court's determination that Mesich possessed testamentary capacity because of our duty to give due regard to the court's function in determining the credibility of witnesses. As we said in In re Estate of Kraft:[20]

A decision of the issue as to testamentary capacity depended largely, if not entirely, on oral testimony given by witnesses seen and heard by the trial judge. It was his province to judge their credibility, and we may not reverse his decision unless we find it to be clearly erroneous.

But there were other witnesses, not seen and heard by the trial judge, whose testimony on the issue of testamentary capacity was of greater value because of the nature and extent of their association with Mesich. Attorney Taylor, who had done legal work for Mesich from 1945 up to the 1950's, testified that he never could get a lucid story out of Mesich at an interview or on the witness stand in court, that during most of the time he knew Mesich the latter's mind was so confused that he could not grasp the significance of questions even when put to him in his native language, and that in a law suit involving

15. In re Estate of Jamison, 41 Cal.2d 1, 256 P.2d 984, 990 (1953); In re Estate of Bottger, 14 Wash.2d 676, 129 P.2d 518, 526–527 (1942); 1 Page on Wills § 12.42, at 651 (Bowe-Parker ed. 1960).

16. Lynn v. ADA Lodge No. 146 of Ind. Order of Odd Fellows, 398 P.2d 491, 496 (Okl.1965); In re Estate of Wolf, 174 Cal.App.2d 144, 344 P.2d 37, 40 (1959); Succession of Schmidt, 219 La. 675, 53 So.2d 834, 837 (1951).

17. In re Estate of Andersen, 192 Or. 441, 235 P.2d 869, 871 (1951); Houghton v. Jones, 418 S.W.2d 32, 39 (Mo.1967).

18. In re Estate of O'Connor, 74 Ariz. 248, 246 P.2d 1063, 1069 (1952); In re Estate of Goetz, 253 Cal.App.2d 107, 61 Cal. Rptr. 181, 185 (1967); In re Estate of Perez, 206 So.2d 58, 59 (Fla.App.1968); In re Estate of Roberts, 258 Iowa 880, 140 N.W.2d 725, 730 (1966); Succession of Papa, 192 So.2d 854, 858 (La.App. 1966); In re Estate of Jeruzal, 269 Minn. 183, 130 N.W.2d 473, 482 (1964); In re Estate of Lacy, 431 P.2d 366, 368 (Okl.1967); In re Estate of Ekker, 19 Utah 2d 414, 432 P.2d 45, 47 (1967); In re Estate of Morton, 428 P.2d 725, 729 (Wyo.1967).

19. In re Estate of Lacy, 431 P.2d 366, 368 (Okl.1967). See cases cited in note 18 supra.

20. 374 P.2d 413, 416 (Alaska 1962).

some of Mesich's property, Mesich was almost of no help in determining how much property he owned.

Blazo Bigovich, who was appointed guardian of Mesich's estate in 1951, testified that Mesich could not talk about any business matters, that he did not understand even when Bigovich spoke to him in his own Slavic language, that Mesich did not know what property he had deeded away, that Mesich could not figure out how things had happened, that he seemed to have very little understanding about things, that during a law suit where Mesich was involved Mesich "didn't know what was happening any more than the man in the moon", and that this was Mesich's condition from the time Bigovich was appointed guardian in 1951 until about 1953 when Mesich had a stroke.

Dr. Schaible, who had treated Mesich for the 1942 injury to his head, and who had observed Mesich over a 10 year period from 1942 to 1953, said that he thought that Mesich's mental condition deteriorated during that time, that he had lapses of memory and was disoriented, and that he was not mentally competent.

George Bojanich, who was called to be an interpreter for Mesich in a law suit where Mesich was the defendant, said that he attempted to speak the Slavic language to Mesich, but was unable to make Mesich understand the questions.

Finally, there was the testimony of Drazenovich in the 1953 suit in the Territorial District Court, which we have already referred to, where Drazenovich made it clear that in his opinion Mesich was mentally incompetent after he suffered the 1942 injury to his head.

◾ None of these witnesses were seen or heard by the trial judge. They had testified only before the probate master and not at the hearing held by the superior court. The superior court judge had no greater opportunity than we to judge their credibility, since his only contacts with these witnesses was through the typed transcript of their testimony before the probate master. In this situation we are in as good a position as the trial judge to make a determination of fact based upon such testimony.[21]

◾ We consider this evidence more important than the testimony of the other witnesses that the trial judge did see and hear. From such evidence in particular, and along with other evidence in the record, we are left with the definite and firm conviction that the trial judge was mistaken in finding that Mesich possessed testamentary capacity at the time of the execution of the 1952 will. It is our determination that at that time Mesich did not have sufficient mental capacity to understand the nature and extent of his property, the natural or proper objects of his bounty, and the nature of his testamentary act.[22] Our conviction that such a mistake has been made means that the trial judge's finding that the testamentary capacity existed in 1952 is clearly erroneous.[23] In view of this determination it is unnecessary for us to pass upon the court's finding that this will was not the product of undue influence.

The judgment of the superior court rejecting and denying probate of the Paskvan will of September 18, 1946 is affirmed. The judgment admitting to probate the Drazenovich will of August 25, 1952 is reversed. The case is remanded to the superior court for further proceedings not inconsistent with the views expressed in this opinion.

21. Fairbanks Publishing Co. v. Pitka, 445 P.2d 685, 687–688 (Alaska 1968).

22. In re Estate of Kraft, 374 P.2d 413, 415–416 (Alaska 1962).

23. Fairbanks Publishing Co. v. Pitka, 445 P.2d 685, 687–688 (Alaska 1968); Perkins v. Willacy, 431 P.2d 141, 142 (Alaska 1967).