**Edmond CRITTELL and Elma Crittell, Appellants,**

v.

**Laura BINGO, Thomas Bingo, Alice Masuyama, Colleen Nishiyama, Elaine Sakaitani, and Leatrice Takeuchi, Interested Parties, and the Estate of Violet M.B. Houssien, Deceased, Appellees.**

No. S–9468.

Supreme Court of Alaska.

Nov. 9, 2001.

Rehearing Denied Dec. 21, 2001.

Sanford M. Gibbs, Brown, Waller & Gibbs, P.C., Anchorage, for Appellants.

Richard G. Haggart, Law Offices of Richard G. Haggart, P.C., Anchorage, for Appellees.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Eighty-five-year-old Violet M.B. Houssien died alone in December 1997. In a will executed two years previously, she left almost all of her $1.59 million estate to an acquaintance, Elma Crittell, and named Elma's husband, Edmond, as a contingent beneficiary and the executor of the estate. Several interested parties challenged the will, alleging that it was fraudulent, that Houssien lacked testamentary capacity, and that she was unduly influenced by the Crittells when she executed it. After a lengthy trial, the superior court agreed with the interested parties. The court declared the 1995 will invalid and ordered the Crittells to pay enhanced attorney's fees. The Crittells appeal, challenging the merits of the decision and the award of fees. We affirm on the merits, holding that the superior court's decision correctly applies the law and finds support in substantial evidence; but we remand on the issue of attorney's fees, finding that the enhanced fee award mistakenly applies Alaska's offer of judgment rule.

## II. FACTS AND PROCEEDINGS

Violet M.B. Houssien died alone of natural causes in her downtown Anchorage home on December 29, 1997. Houssien was eighty-five years old when she died. She had lived by herself since her husband's death in 1981. At the time of her death, her estate was worth approximately $1.59 million.

Houssien's health deteriorated significantly over the last ten years of her life. She experienced numerous serious physical and mental ailments. Her mental problems included ongoing depression, anxiety, episodes of panic disorder, and a paranoid delusional state that began after Houssien suffered a series of strokes beginning in 1993. Houssien's physical problems required her to take a variety of medications that aggravated her mental problems.

Houssien was hospitalized on several occasions in the late 1980s and early 1990s and spent time convalescing in assisted care facilities. Determined to live an independent existence, however, Houssien left the Pioneer's Home in 1992 against the advice of her physician and moved back to her residence. After returning home, Houssien required regular home health care services; she also relied heavily on help from friends and people she hired to perform the various jobs and errands that were required to meet her daily needs.

Houssien became actively involved with the Crittells in 1993. Elma Crittell's sister had been a good friend of Houssien's before Elma's sister left Alaska in 1991. In late 1993 Houssien began using Edmond Crittell as a handyman around the house; Elma Crittell ran numerous errands for Houssien, helped with her finances, and assisted with her personal needs. The Crittells befriended Houssien and socialized with her frequently during this period. Over the following year, the relationship intensified, and Houssien grew increasingly dependent on the Crittells' companionship and assistance. According to the Crittells, their relationship with Houssien cooled significantly in late 1994, when Houssien became upset with Edmond Crittell for taking some of her financial and tax records. Although the Crittells claimed that they had little further contact with Houssien after this quarrel, the record seems to belie this assertion, documenting a series of contacts that continued until the time of Houssien's death.

Shortly after Houssien died, Edmond Crittell petitioned the superior court to appoint him as the personal representative of Houssien's estate and to accept for informal probate a will that Houssien had executed on March 22, 1995. The 1995 will left a modest sum of cash to each of Houssien's six siblings

and gave the rest of Houssien's estate to Elma Crittell. The will named Edmond Crittell as executor and designated him as a contingent beneficiary in the event of a default by Elma.

Edmond Crittell's petition for informal probate was challenged by two of Houssien's sisters. The interested parties, Houssien's sisters, initially questioned whether the signature on the 1995 will was actually Houssien's and, alternatively, alleged that Houssien lacked testamentary capacity and acted under undue influence in executing the will. In lieu of the 1995 will, the interested parties offered for probate a prior will and codicil—executed by Houssien in 1989 and 1990—that left the bulk of Houssien's estate to her family.

The will contest came to trial before Superior Court Judge Peter A. Michalski. In support of the 1995 will, the Crittells testified that in early January 1998 they received a telephone call from an unidentified person who said that they would soon receive something important in the mail. Several days later, on January 9, 1998, they received an anonymous mailing.[1]

The mailing consisted of two separate envelopes. One of the envelopes was marked to indicate that it should be opened first; the second indicated that it should be opened in the presence of George Goerig, an Anchorage attorney. Upon opening the first envelope, the Crittells found that it contained an undated, typewritten note to the Crittells from someone identified only as "Kim," who claimed to have typed and mailed Houssien's will and other documents at Houssien's request as a favor for help that Houssien had earlier rendered to Kim's sister. The first envelope also contained other documents typed by Kim, including a letter dated March 22, 1995, from Houssien to the Crittells, in-

structing them to take the second envelope, unopened, to attorney Goerig.[2] Edmond Crittell took this envelope to Goerig; the envelope contained a will purporting on its face to have been executed by Houssien on March 22, 1995. The Crittells denied any prior knowledge of the 1995 will's existence or the circumstances surrounding its execution.

In opposing the 1995 will at the trial, the interested parties did not challenge the authenticity of Houssien's signature; rather, they sought to establish that the will was a fraud. Their theory was that Houssien lacked testamentary capacity when she signed the will, and that she acted out of undue influence as a result of the Crittells' fraudulent conduct. To support this theory, the interested parties presented evidence tending to show that the Crittells befriended Houssien and deliberately curried her favor at a point in her life when she was particularly isolated, frail, and mentally vulnerable; that they reduced her to a state of dependency and tricked her into signing papers in blank; that on March 22, 1995, they appeared with Houssien at an Anchorage business known as Mail Boxes, Etc., with two witnesses—one Elma Crittell, the other unknown—who signed the will in front of a notary but fraudulently misrepresented their true identities; that the Crittells thereafter arranged to have the Mail Boxes, Etc., store burglarized in order to remove the records of notarization, which might have allowed the fraudulent witnesses to be identified; and that they subsequently kept Houssien from contacting an attorney to change the 1995 will.

After hearing a trial lasting more than nine full days and including testimony from thirty-seven witnesses, Judge Michalski issued a written decision that accepted the interested parties' theory of fraud, lack of

---

1. The Crittells asserted that they did not even know that Houssien had died at this time and that the anonymous mailing was their first indication of Houssien's death.

2. Other documents in the first envelope included a letter to Goerig dated March 22, 1995, indicating that the second envelope contained a will and asking Goerig for help in ensuring that Houssien's prior will was revoked; a letter of instruc-

tion by Houssien, also dated March 22, 1995, purporting to revoke all of Houssien's prior wills, codicils, and the Houssien Revocable Trust; an undated letter to Houssien's surviving siblings, urging them not to challenge Houssien's most recent will; and a paper dated January 8, 1997, titled "Addition to Will," reaffirming Houssien's desire to give her estate to the Crittells and urging them to accept the gift.

testamentary capacity, and undue influence. Judge Michalski stated his conclusions as follows:

> The court finds in favor of the interested parties and decides that the Will of March 22, 1995 submitted to the court and supporting documents were not prepared at Ms. Houssien's request and did not convey her last will. The court also finds that, at the time of the Will signing, Ms. Houssien was not capable of making a will and that undue influence was imposed on this deteriorating, vulnerable and dependent woman at the time the Will was signed.
>
> Though denied by the Crittells, the evidence proves that the Will and "Kim" papers were prepared by the Crittells or at their direction and signed at Mail Boxes Etc. while they were present. Further, no witness was presented at trial who established Ms. Houssien's competence at the time of signing and, in fact, all the evidence suggests she was frail, vulnerable, teary-eyed (though a chronic sufferer of a lack of tears syndrome) and so weak as to cause the notaries to inquire if she was all right. The court finds she signed the supporting papers under a false pretext and before the content was placed on them and that the content placed there was not at her direction. The court further finds that the burglary of the notary logbook was related to the Will and was performed to remove evidence of the witnesses in this case. The court finds the language usage, as well as content of the supporting documents, is concocted and a fraud.
>
> The court further finds that Ms. Houssien progressively deteriorated during her last decade and, though there were many times during her last years in which she was competent, the record before the court reflects that, at the time of the Will signing, she was not competent due to aging and medicines, and was at the mercy of the Crittells' effort to influence her Will.

The judge supported these conclusions with nearly thirty pages of detailed factual findings that he drew from the conflicting evidence presented at trial.

The Crittells appeal, challenging the superior court's findings and contending that the court misapplied applicable law. Because these findings are central to the issues at hand and set out a description of the evidence that eludes accurate summarization, we attach them as an appendix to our opinion.

## III. DISCUSSION

### A. Standard of Review and Standards Governing Testamentary Capacity and Undue Influence

▮▮ Issues of testamentary capacity and undue influence involve questions of fact that we review under the clearly erroneous standard.[3] Factual findings are clearly erroneous only if we are left with "a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding."[4] In reviewing a trial court's findings for clear error, we consider the evidence in the light most favorable to the party prevailing below.[5]

▮▮ The standard for finding testamentary capacity is well established in Alaska. We first described the three elements of testamentary capacity in *In re Estate of Kraft:*

> The question is always whether ... [the testator] had sufficient mental capacity to understand the nature and extent of [her] property, the natural or proper objects of [her] bounty, and the nature of [her] testamentary act.[6]

More recently, in *In re Kottke*, we emphasized that a finding of incapacity may be based on the absence of a single element: if the court finds a deficiency on any one of the three elements of testamentary capacity, the

---

**3.** See *In re Estate of Kottke*, 6 P.3d 243, 245 (Alaska 2000); *In re Estate of Kraft*, 374 P.2d 413, 416 (Alaska 1962); *see also* Alaska R. Civ. P. 52(a).

**4.** *Kottke*, 6 P.3d at 245 (quoting *Mathis v. Meyeres*, 574 P.2d 447, 449 (Alaska 1978)).

**5.** See *id.*

**6.** 374 P.2d at 416.

court must invalidate the will.[7] But the deficiency must be shown to have existed when the will was executed.[8]

■ The test of undue influence is also well established. The party challenging a will must prove that "the testator was virtually compelled to make a will [that the testator] would not have made [if] left to the free exercise of [the testator's] own judgment and wishes."[9] We approach this issue by asking whether a person used "coercion and duress which would act as a dominating power over the mind and act of a testator."[10] In other words, was the willpower of the testator "so destroyed as to substitute the will of another?"[11] The test for undue influence does not presume the existence of an objectively determined "reasonable testator" but instead considers the personal strengths and weaknesses of the testator in the particular case at issue:

> [T]he presence of undue influence is measured by a subjective standard. The existence of undue influence in a particular case is to be determined by ascertaining the effect of the influence which was, in fact, exerted upon the mind of the testator, considering his physical and mental condition, the person by whom it was exerted, the time and place and all the surrounding circumstances; and not by determining the effect which such influence would have had upon the mind of the ordinarily strong and intelligent person.[12]

7. See Kottke, 6 P.3d at 246.

8. See In re Estate of Kraft, 374 P.2d 413 (Alaska 1962); 1 William J. Bowe & Douglas H. Parker, Page on the Law of Wills § 12.2, at 571–74 (rev. ed.1960).

9. Kraft, 374 P.2d at 417.

10. Paskvan v. Mesich, 455 P.2d 229, 234 (Alaska 1969) (citing Kraft, 374 P.2d at 417).

11. See 1 Bowe & Parker, supra note 8, § 15.2, at 715 ("Undue influence exists only when the will power of the testator is destroyed, and his own will is borne down. His freedom of will must be so destroyed as to substitute the will of another for his own." (footnotes omitted)).

12. Id.

B. *Sufficiency of the Trial Court's Decision*

■ As a threshold matter, the Crittells complain that the trial court's findings are deficient. Because the superior court did not expressly allocate the burden of proof, recite the legal standards governing testamentary capacity and undue influence, label any portion of its decision as a statement of its legal conclusions, or bolster the decision with citations to any case law, the Crittells assert that the court left no "clue as to what conclusions of law it reached," thereby violating Alaska Civil Rule 52(a).

■ These contentions are meritless. Rule 52(a) provides that a court conducting a nonjury trial must "find the facts specially and state separately its conclusions of law thereon."[13] We have long read this language to require that a trial court "give the Supreme Court a clear understanding of the basis for the decision made."[14] But by the same token we have recognized that it does not "invariably require that the findings and conclusions be properly labeled, or even that express findings be made on all questions, so long as the record clearly indicates that the court considered the matter and resolved each critical factual dispute."[15] The core purpose of the rule, then, is to enable the appellate court to conduct a meaningful review of the trial court's decision-making process.[16]

Here, the superior court's opinion readily meets this purpose. Although the court did

13. Specifically, Alaska Rule of Civil Procedure 52(a) states:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

14. Sullivan v. Subramanian, 2 P.3d 66, 69 (Alaska 2000) (quoting Dickerson v. Geiermann, 368 P.2d 217, 219 (Alaska 1962)).

15. Urban Dev. Co. v. Dekreon, 526 P.2d 325, 328 (Alaska 1974).

16. See id.

not explicitly designate any part of its opinion as a statement of its legal conclusions, the section of the opinion labeled "THE DECISION" (most of which we have quoted above) plainly embodied the court's legal conclusions and was intended as such; it is followed by a separate section stating at length the court's supporting "FINDINGS OF FACT." While it is true that the superior court's opinion cites no supporting legal precedent, the Crittells fail to identify any notable departure from established legal standards; and they offer no legal authority suggesting that Rule 52(a) should be read to require a trial court to pad a substantively correct statement of legal conclusions with supporting citations.

Moreover, the legal standards governing the parties' dispute were essentially uncontroverted below. In a pretrial motion to establish the law that would govern the case, the Crittells set out relevant case law from Alaska and other jurisdictions concerning tests, standards, and burdens of proof in testamentary capacity and undue influence cases. In response, although the interested parties took issue with various factual assertions set out by the Crittells, they conceded that "[t]he parties do not dispute the basic law, and the respective burdens of proof, that each side [will] bear at trial." The Crittells agreed with this assertion: their reply expressly acknowledged that "[t]he parties agree on the fundamental legal tests and on the burdens of proof in AS 13.16.170 to be applied in this case." In context, then, it hardly seems surprising that Judge Michalski found little need to articulate and cite precedent for the legal principles underlying his conclusions.

■ The Crittells nevertheless note two comments in the superior court's opinion that, in their view, suggest a misapplication of the correct burdens of proof. Pointing first to language in the findings of fact that describes them as "defending" the 1995 will, the Crittells assert that the superior court might have mistakenly believed that the Crit-

tells bore the burden of proving the will's validity—a belief that would be contrary to settled law.[17]

But the court's statement suggests just the opposite: it indicates that the superior court allocated the burden correctly. Because plaintiffs, not defendants, ordinarily bear the burden of persuasion, the court's description of the Crittells as "defending" the 1995 will implicitly recognized that—as is commonly the case with defendants—they did not bear the burden of persuasion on the point. In referring to their defense of the will, the court simply recognizes the reality that, even though they had no burden, the Crittells did choose to present evidence defending the will; and the court accurately describes their evidence.

■ The Crittells raise a similar issue by pointing to a comment in the superior court's opinion stating that "no witness was presented at trial who established Ms. Houssien's competence at the time of signing." Correctly observing that a party asserting testimonial incapacity must show incompetency at the time of signing,[18] the Crittells insist that the court's comment betrays its failure to recognize that the interested parties—not the Crittells—bore the "burden of proof that *at the time* Violet Houssien signed the March 22, 1995 will, she *did not have* the requisite capacity to execute the will."

But when the disputed comment is read in context, it evinces no confusion on this point. Immediately after noting the absence of any evidence suggesting Houssien's competency at the time of signing, the superior court emphasized that "in fact, all the evidence suggests she was frail, vulnerable, teary-eyed (though a chronic sufferer of a lack of tears syndrome) and so weak as to cause the notaries to inquire if she was all right." These observations, briefly stated in "THE DECISION" section of the court's written opinion, were followed by an extensive discussion in the "FINDINGS OF FACT" section that summarized the interested persons' affirma-

---

**17.** *See Paskvan v. Mesich,* 455 P.2d 229, 233, 239 (Alaska 1969) (recognizing that contestants in a will contest bear the burden of establishing undue influence and lack of testamentary capacity); AS 13.16.170 (same).

**18.** *See In re Estate of Kraft,* 374 P.2d 413, 416 (Alaska 1962).

tive evidence of incapacity—evidence that the court recognized as focusing on the moment of signing instead of on Houssien's general condition.

Viewed in its entirety and against the backdrop of these factual findings, the opinion's disputed comment concerning the lack of any evidence tending to show competency seems uncontroversial: it simply notes, as a practical matter, that the Crittells failed to refute any of the evidence of incapacity that the interested parties presented in support of their burden on the issue.[19]

To summarize, then, the superior court's opinion adequately explains the factual and legal grounds for its ruling, provides an ample basis for meaningful appellate review, evinces no misunderstanding of applicable law, and therefore fully satisfies the requirements of Civil Rule 52(a).

C. *Factual Findings and Sufficiency of Evidence*

The Crittells scatter most of the rest of their briefing on evidentiary details. They assert that the trial court's factual findings conflict with or fail to explain various items of evidence favoring their view of the case and that the court drew unreasonable inferences from testimony in some instances, while overlooking reasonable inferences in others. The Crittells maintain that the factual findings are clearly erroneous in many particulars and that the evidence as a whole fails to sustain the conclusion that Houssien lacked testamentary capacity or was a victim of undue influence.

■ But while these arguments fell an occasional tree, they leave a forest of evidence standing. The Crittells' strongest factual point is their challenge to the trial court's findings on testamentary capacity. The trial testimony concerning Houssien's intellectual acuity left considerable room for ambiguity: while some witnesses painted a picture of Houssien as progressively declining in physical strength and mental awareness, others depicted her as capable of understanding and controlling her financial situation in most circumstances.

But the trial court expressly recognized these testimonial conflicts and carefully considered them in its decision. The court's findings, set out in the attached appendix, largely speak for themselves. In reviewing these findings for clear error, we do not reweigh the evidence or redetermine issues of testimonial credibility. Instead, our task is limited to deciding whether the trial court articulated a reasonable basis for its decision that is supported by substantial evidence and does not leave us firmly convinced of clear error.

Here, the superior court's finding of testamentary incapacity correctly focused on the day of the contested will's signing; the court expressly found that, "though there were many times during her last years in which [Houssien] was competent, the record before the court reflects that, at the time of the Will signing, she was not competent due to aging and medicines, and was at the mercy of the Crittells' effort to influence her Will." This finding unequivocally expresses the court's conclusion that Houssien lacked sufficient mental capacity to understand the nature of her testamentary act. Our examination of the record reveals ample evidence to support this conclusion and fails to convince us that the court's findings are clearly erroneous in any significant respect.

■ Moreover, even if we were persuaded that the interested parties failed to meet their burden of proving testimonial incapacity, the evidence concerning Houssien's declining health and diminishing mental fitness would nonetheless weigh strongly in favor of the court's alternative conclusion that Houssien was a victim of the Crittells' fraud and

19. It is worth reemphasizing in this connection the absence of any controversy below over the proper allocation of burdens of proof. Indeed, at the pre-trial status conference, counsel for the Crittells took pains to explain his reliance on the understanding that the Crittells would bear the initial burden of producing a facially valid will and that, once they met this minimal burden, the interested parties would assume the burden of proof in contesting the will. Judge Michalski echoed this understanding, stating that he believed it appropriate for the interested persons to "act as plaintiff . . . to use the regular civil idea, that you attack this thing that, on its face, appears to be valid."

undue influence. Because we measure undue influence by a subjective standard, the extensive evidence of Houssien's physical and mental impairments bears directly on the issue of undue influence by indicating that she was particularly vulnerable to the kind of fraudulent scheme allegedly perpetrated by the Crittells. And the record contains compelling evidence of undue influence in other respects, as well.

As mentioned above, the interested parties asserted at trial that the 1995 will was an elaborate fraud concocted by the Crittells. The trial court accepted this theory and detailed the supporting evidence in its decision;[20] these details need not be repeated here. Our review of the record convinces us that the trial court's findings are supported by overwhelming circumstantial evidence that the Crittells overbore Houssien's free will by their fraudulent conduct.[21]

Although we have never had occasion to review a will contest involving undue influence allegedly perpetrated by fraud, in *Paskvan v. Mesich* we favorably cited an Oregon Supreme Court decision that addressed the situation.[22] In *In re Reddaway's Estate*, the Oregon court set out a helpful list of factors to consider in determining the presence of undue influence arising from a fraud: whether the testator (1) received independent advice in the will-making process, (2) shrouded the will in secrecy and haste (suspicious circumstances), (3) exhibited an unexplained change in attitude toward others, (4) suddenly changed a prior plan of disposition, (5) made unnatural or unjust gifts, or (6) demonstrated a susceptibility to influence

based on a weak physical or mental condition.[23]

Judged by these common earmarks of fraudulent influence, the record easily supports the superior court's finding of undue influence. First, although Houssien had employed attorneys to draft her prior wills, the 1995 will was produced without the aid of counsel; further, the record contains substantial evidence suggesting that the Crittells impeded Houssien's access to counsel after the will was signed. Second, the drafting, execution, and publication of the 1995 will were shrouded in secrecy, haste, and suspicious circumstances. Third, the will exhibited an unexplained—or at least irrationally explained—change in Houssien's attitude toward others. Fourth, the 1995 will reflects a sudden change in Houssien's prior plan of disposition. Fifth, the will's gift to Elma Crittell—almost completely excluding all other beneficiaries—certainly seems unnatural and unjust. And sixth, as we have previously discussed, Houssien's physical and mental impairments made her particularly susceptible to—and a natural target of—undue influence.

In summary, then, the findings on undue influence are not clearly erroneous, and we find no factual or legal reason to disturb the superior court's judgment declaring the 1995 will invalid.[24]

### D. Attorney's Fees

■ The only remaining issue is the superior court's award of attorney's fees. Pri-

---

**20.** *See* Appendix at ¶¶ 2–59.

**21.** As we noted in *Gabaig v. Gabaig*, 717 P.2d 835, 838 (Alaska 1986), "Existence of a fraudulent intent is a question of fact, often proven by circumstantial evidence." The Crittells insist that the absence of any substantial evidence establishing a confidential relationship between them and Houssien essentially defeats the claim of undue influence. But this argument is a red herring, since the only effect of showing that the Crittells were involved in a confidential relationship with Houssien would be to shift the initial burden of producing evidence establishing valid execution; the showing would not have altered the ultimate burden of persuasion. *See Paskvan*, 455 P.2d at 233–34. Because the Crittells presented substantial evidence of proper execu-

tion—which ultimately proved unpersuasive—the superior court's failure to consider the existence of a confidential relationship has no conceivable bearing on the outcome of its decision.

**22.** *See Paskvan*, 455 P.2d at 234 n. 10 (citing *In re Estate of Reddaway*, 214 Or. 410, 329 P.2d 886, 890 (1958)).

**23.** *Reddaway*, 329 P.2d at 891–93.

**24.** Upon declaring the 1995 will invalid, Judge Michalski admitted to probate Houssien's prior will of October 9, 1989, as amended by the first codicil of October 5, 1990. Because no party challenges this determination, we need not address it.

or to trial, the interested parties made a $100,000 offer of judgment to the Crittells. The Crittells declined the offer and proceeded to trial. After Judge Michalski decided the case in their favor, the interested parties applied for costs and attorney's fees, requesting enhanced fees under Civil Rule 68's offer of judgment provision or, alternatively, under Civil Rule 82(b)(3)'s enhancement provisions. In support of their application, the interested parties submitted a statement splitting their attorney's fees into two categories: (1) $136,409.85 for fees incurred from inception of the case to the expiration of their offer of judgment; and (2) $196,258.50 for fees incurred after the offer expired.

The superior court ultimately awarded the interested parties $166,134.18 in attorney's fees, indicating that this award was based on Rule 68(b)(2).[25] This sum reflects fifty percent of the interested parties' total fees—fees earned both before and after their offer of judgment.

On appeal, the Crittells cursorily argue that the superior court abused its discretion in awarding enhanced attorney's fees under Civil Rule 82(b). The interested parties respond by correctly noting that the court actually awarded attorney's fees under Civil Rule 68(b)(2). But while this response disposes of the Crittells' argument under Rule 82(b), it raises a troublesome new issue.

The express terms of Rule 68(b)(2) entitled the interested parties to recover only fifty percent of their reasonable and actual attorney's fees "from the date the offer was made."[26] Because the court's order awarding the interested parties fifty percent of their total fees conflicts with the plain language of Rule 68(b)(2), we hold that the

order amounts to plain error. The error requires us to vacate the order awarding attorney's fees and to remand the issue of fees for reconsideration in light of Rule 68(b)(2)'s express limitation.

The trial court's award of enhanced fees under Rule 68(b)(2) raises other potential issues. For instance, it is unclear whether the interested parties' offer of judgment was made more than sixty days after the deadline for filing "disclosures required by Civil Rule 26."[27] It is likewise unclear whether the offer of judgment amounted to an impermissible joint offer.[28] Moreover, we note that Rule 68(c) appears to require attorney's fees to be awarded under Rule 82(b) in certain offer of judgments situations. Rule 68(c) provides that

> if the amount awarded an offeror for attorney fees under Civil Rule 82 is greater than a party would receive under paragraph (b), the offeree shall pay to the offeror attorney fees specified under Civil Rule 82 and is not required to pay reasonable actual attorney fees under paragraph (b). A party who receives attorney fees under this rule may not also receive attorney fees under Civil Rule 82.

Because neither party has adequately briefed any of these issues, we decline to consider them, leaving them for the superior court to address upon remand. In remanding this case, we do not preclude the superior court, in the exercise of its discretion on remand, from reconsidering its initial decision denying the interested parties' motion to award enhanced fees under Rule 82(b)(3).

## IV. CONCLUSION

We AFFIRM the superior court's judgment invalidating Violet M.B. Houssien's

---

**25.** In a prior order, the court had expressly declined to consider enhancing fees under Rule 82(b)(3).

**26.** Alaska Rule of Civil Procedure 68(b)(2) provides:

If the judgment finally rendered by the court is at least 5 percent less favorable to the offeree than the offer, or, if there are multiple defendants, at least 10 percent less favorable to the offeree than the offer, the offeree, whether the party making the claim or defending against the claim, shall pay all costs as allowed under the Civil Rules and shall pay reasonable actual

attorney fees incurred by the offeror *from the date the offer was made* as follows:

. . . .

(2) if the offer was served more than 60 days after both parties made the disclosures required by Civil Rule 26 but more than 90 days before the trial began, *the offeree shall pay 50 percent of the offeror's reasonable actual attorney fees*[.]

(Emphasis added.) *See also* AS 09.30.065.

**27.** *See* Alaska R. Civ. P. 68(b)(2).

**28.** *See Brinkerhoff v. Swearingen Aviation Corp.*, 663 P.2d 937, 943 (Alaska 1983).

1995 will. We VACATE the court's order awarding attorney's fees and REMAND for reconsideration in accordance with this opinion.

MATTHEWS, Justice, not participating.

*APPENDIX A* *

IN THE SUPERIOR COURT FOR
THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT
AT ANCHORAGE

In the Matter of the Estate of

VIOLET M.B. HOUSSIEN,

Deceased.

*FINDINGS OF FACT AND DECISION
FROM TRIAL*

. . . .

FINDINGS OF FACT

1. Violet M.B. Houssien was born September 8, 1912, in Hawaii and was discovered dead at her home in Anchorage, Alaska on December 29, 1997.

*The Declining Years*

2. Ms. Houssien outlived her husband Abraham Houssien, who died in 1981. She lived in the Pagoda Restaurant building located at 5th and A Street until she died. It was important to her to remain in her own home—a recognized preference of almost all. But, because of the ravages of old age, which began taking their toll during the last ten years or so of her life, her accomplishing this degree of independence was quite a feat and required a lot of help.

3. During her decade of decline, the deceased was in and out of the hospital for a number of serious problems which brought her to the brink of death and which caused her doctor, Michael Armstrong, to consider her return to her home from the sequence of hospital care, and then further convalescence and assisted living at Our Lady of Compassion, the Mary Conrad Center, and the An-

chorage Pioneers' Home very unusual. In late 1989 she suffered iliopsoas abscess, in 1990 life threatening gastrointestinal tract bleeding, and later, flesh eating bacteria. Other medical problems that she dealt with while under Dr. Armstrong's care included chronic gastrointestinal reflux problems, asthma, an underactive thyroid, prolonged grief reaction to the death of her husband in 1981, Sjogren's Syndrome, mental problems of anxiety, panic disorder, and depression. Since 1988 she had suffered significant heart disease caused by hardening of the arteries resulting in chest pain, but, of course, the hardening of the arteries also affected other parts of the body including her brain. This resulted, at least once, in a transient ischemic attack which lasted for several hours. This stroke was manifested by prolonged inattention and was probably one of the sources of the identifiable stroke areas which were observed in a brain image taken only shortly before her death in 1997.

Ms. Davis, of Home Health Care, further described the Sjogren's Syndrome which Ms. Houssien suffered as a lack of tears and saliva.

*Reliance on others*

4. Ms. Houssien left the Pioneers' Home in 1992 against the advice of her doctor, Dr. Armstrong, who was concerned for her and considered her extremely frail and unable to live unassisted in her home in downtown Anchorage. For that reason, he made medical orders which would make it likely that Home Health Care services would be made available to her. This allowed her to be at home and "independent."

5. In 1993, Ms. Houssien fired the Home Health nurse that was assisting her and, from that point on, in addition to subsequent periodic Home Health Care nursing, relied a great deal on a number of people either hired by her or who befriended her and acted in much the same capacity as Home Health nurses. She paid these people for their service, but none of them lasted very long. Dr.

---

* Minor editorial changes have been made to the superior court's decision to conform to our tech-

nical guidelines for publication.

Armstrong was unsure why there was such turnover, but suggested one of the causes was Ms. Houssien's distrustful nature of those who came into her home. He testified to the obvious: she wanted to be independent, but due to her medical condition she had to rely on others to do the things that needed to be done to live in her house by herself rather than in the Pioneers' Home or other assisted living arrangement.

6. Ms. Houssien talked with the doctor about her Will, and he recalled that in the fall of 1997 she wanted the name of the attorney that Dr. Armstrong had earlier referred her to in 1990 when the subject of her Will had come up. She told the doctor, sometime in 1997, that her Will was missing. He does not recall her telling him who she thought had taken it but he did remind her that the attorney was Trigg Davis.

### Interference with care

7. Dr. Armstrong reported an incident where a man—who turned out to be Edmond Crittell, of whom we learn more later—accompanied Ms. Houssien to see him and that the man was verbally belligerent about the antacid that Dr. Armstrong was prescribing for Ms. Houssien and told the doctor "don't you know ulcers are caused by bacteria...." Understandably, this conduct resulted in the doctor shooing him out to the waiting room. Viewed from a friend's perspective, this "interference" may seem like advocacy. From the doctor's perspective, it amounted to ignorant meddling. Ms. Houssien's problem was not bacterial ulcers.

8. Dr. Armstrong did not recall that either of the Crittells promoted the stopping of necessary medicine, Keflex, prescribed to deal with Ms. Houssien's leg wound in 1994, but identified a nurse's note (ex. 8, p. HHC515) which stated "Clt distress about Ed & Alma criticising [sic] her medical management: Alma [Elma] visited, she call MD today to ask why Keflex is being continued although wound is not infected."

9. Ms. Davis, of Home Health Care, reported Ms. Houssien was very upset with Mr. Crittell's interference with her medicine management and the incident in Dr. Armstrong's examining room. It was Ms. Davis's view that Ms. Houssien had a lot of confidence in her doctor and that Ms. Houssien believed that her treatment was none of Mr. Crittell's business.

### Report of Robbery

10. Carol Moore, Dr. Armstrong's nurse, testified that she worked with Dr. Armstrong from 1993 to 1995 and that she was aware of Ms. Houssien as a patient of the doctor. She met Ms. Houssien many times and spoke with her on the phone many times. She considered Ms. Houssien to be a very intelligent person. On March 20, 1995, Ms. Houssien called the office and was "very, very upset and kind of crying." She reported that she had just been "robbed" and that a lot of money was taken: $135,000. The stated reason that she called was that she wasn't going to be able to make an appointment that day due to the "robbery" and being too upset by it. The particular nurse's note of the incident (which incident Ms. Moore remembered independently due to the unusual nature of it) was as follows:

> 3–20–95 pc from pt-rambling for 70 mins re: Robbery ($135,000) & just about everything else—I really don't know why she called except for someone to talk to: due to above she didn't make her appt—will reschedule—CMoore.

Ms. Moore testified that the "robbery" report was a very unusual event, though it was not necessarily unusual for Ms. Houssien to call and talk at length to Ms. Moore. Ms. Moore recalled that Ms. Houssien was suspicious of the handy man in relation to the so-called "robbery." (Later findings clarify this to be an alleged burglary.)

### The Will signing

11. The Will being tested in this action is one that is dated March 22, 1995.

12. On that date, two days after the report of an alleged "robbery," Violet M.B. Houssien signed a Last Will and Testament at the Mail Boxes Etc. store on Fourth Avenue in Anchorage, Alaska.

13. Tanya Nelson, then 30, was a managing clerk at the store and began helping Ms.

Houssien and those who were with her. Ms. Nelson remembers four of the people there: Ms. Houssien, who was at that point a frail elderly Japanese American, a taller Asian woman, a Caucasian man, and an "older" Caucasian woman.

14. Ms. Nelson's memory of Ms. Houssien and her condition is that she had watery eyes—so much so that Ms. Nelson put out tissues for her; that Ms. Houssien looked frail and winded and appeared to need to sit down. Ms. Nelson remembers providing a seat for her.

15. Because Ms. Nelson was involved with a rush copying job for a customer's legal deadline, she eventually turned the notary process over to a co-worker, Junalee Fernandez. Before that happened, however, Ms. Nelson got a look at the people there for the signing. She initially thought the man with Ms. Houssien was a friend of her father's named Dan Heiner. But, upon closer inspection, she realized that it was not him. Ms. Nelson thought that the Caucasian woman resembled her stepmother.

16. Ms. Nelson made in-court identification of Edmond and Elma Crittell as the two Caucasian people she remembers being members of the party at the signing of the Will that day. But Ms. Nelson's identification is suspect because of the suggestive procedure used by Leonard Hackett in investigating the case. Hackett presented a photographic lineup to Ms. Nelson more than three years after the signing and, according to her testimony, he included multiple photographs of the Crittells in their respective lineups.

17. The photo lineups themselves were not submitted to the court for viewing or determination whether they were actually so suggestive or unfair as to require the absolute exclusion of any identification by Ms. Nelson. But, absent other indicia of reliability of the identification, the court would give little weight to or reject outright the identifications made subsequent to the photo lineups due to the procedure used.

18. In fact, Ms. Nelson appears to have independently remembered the Will signing and the related people because of an ex-traordinary incident near in time: a burglary of the Mail Boxes Etc. store in which the *only* thing stolen was the notary log book kept by the store. According to Ms. Nelson, the burglary, which occurred the weekend after the Will signing, was the non-stop topic of discussion around the store for the next ten days as the staff there, primarily Ms. Nelson and Ms. Junalee Fernandez, tried to remember each transaction and the people that had anything to do with the log book. This effort to figure out which transaction might motivate the theft of the log book contributed to the quality of their memory of the Will signing. Additionally, the associative form of memory that Ms. Nelson applies suggests that she independently recollected the Crittells being present in spite of the suggestiveness of Leonard Hackett's lineups: she remembered first thinking on seeing the Caucasian man that he was a friend of her father and, on seeing the Caucasian woman that she looked like her stepmother. The court finds that the photograph provided of her father's friend does resemble Mr. Edmond Crittell. The court is unaware of what Ms. Nelson's stepmother looks like. It is clear, however, that Ms. Nelson generally described the older Caucasian woman as having a significant overbite. The photographs of Ms. Crittell, as well as her appearance in court, do demonstrate that she is middle-aged as described (an "older" Caucasian woman to a woman then thirty), and she has a substantial overbite.

19. Evidence related to the transactions which took place at Ms. Crittell's store where she says she was working alone the day of the Will signing demonstrate that there was an hour and a half gap between transactions, which—though possibly not unusual—would have allowed Ms. Crittell to go downtown and be present at the signing. Ms. Crittell notes in her testimony that her lease requires her store to be open for mall hours and she says that during mall hours she only leaves and closes the store for five minutes or so to use the toilet.

20. Another reason why Tanya Nelson would have a reliable independent basis for her recollection of the event and the participants in the signing is that, as manager, she

not only started the transaction and transferred it to her co-worker, but continued to supervise it throughout its completion.

21. Ms. Nelson's co-worker, Junalee Fernandez, testified that she followed all normal procedures for notarizing. The log book—stolen in the subsequent burglary—was kept under the counter where it was easily available to the staff and obvious to customers, who were observant, as to where it was kept. Ms. Fernandez used the log book to record the names of the persons signing, the identification used, and the addresses of the persons being identified. Ms. Fernandez only recalls the woman whose will it was (an older lady with a cane), a man (kind of bald), and a taller Asian woman. One of the witnesses had a California license for identification, but gave her address as Tokyo. So Ms. Fernandez checked with Ms. Nelson to see if it was alright to continue the notary process. They both recall the complication that arose and the need for attention to this detail.

22. Former Anchorage Police Department Investigator Joseph Austin's testimony about suggestive photographic lineups is well taken but, under the facts of this identification and the basis for Ms. Nelson's identification, the court finds that Edward and Elma Crittell were present at the signing of the Will, in spite of their testimony to the contrary.

23. The presence of the Crittells at the signing of the Will which makes Ms. Crittell the primary beneficiary (residually) and Mr. Crittell the personal representative is interesting in itself, but it is significant primarily because of their denial of that fact, the alleged manner in which the Will was produced to the court, and the court's finding that the Will and the papers accompanying it are fraudulent documents, about which more will be said later.

24. It turns out that no one can find or has ever heard of Sue Parks or Suki Nakamura, the alleged witnesses to the Will. The failure to find a witness in itself is probably not unusual, especially where a will is exceptionally mature. Here, of course, the Will was only about three years old when submitted. Further, testimony of all concerned was that Ms. Houssien was generally very talkative, but never mentioned this Will signing or the witnesses to anyone, including those closest to her and who were her confidants regarding financial matters, for example, Ms. Molena Daniels.

25. Thus, the only admitted witnesses to the Will signing—Nelson and Fernandez—testify that Ms. Houssien was extremely frail, vulnerable looking, with watery eyes, needing Kleenex, thirsty and weak looking. Ms. Nelson was sufficiently concerned about Ms. Houssien that she asked her if she was O.K.

26. The facts related to the signing itself create a motive for theft of the notary book because two people absolutely unknown to all living family or friends of the deceased acted as witnesses to the signing, and their names, identification, and addresses would have been included in the stolen log book. The log book would have aided parties to this action in finding the witnesses or establishing that the addresses and identification provided by them were false. Presentation of the witnesses, of course, would aid in establishing Ms. Houssien's mental and physical condition at the time of the Will signing and any conduct by the Crittells or anyone else that might have affected Ms. Houssien's condition, judgment, or Will.

27. The Crittells, in defending the Will, raise the possibility that the motive for the theft of the notary log book may have been an irregular notarization by Junalee Fernandez at her employer's request related to the employer's very ill mother. The court finds little basis in this as a motive to steal the notary log book as the absence of the recording of the notarization process in the log book does not affect the validity of the notary process. On the other hand, the log book information related to the witnesses' names and addresses of a recorded transaction could have resulted in the parties finding the witnesses or determining that they provided fraudulent identification.

28. The Crittells testified to receiving a package in the mail which contained what have come to be called the "Kim" letters and the Will of March 22, 1995.

29. The record reflects that the package was mailed from a south Anchorage post office.

30. Mr. Crittell testified that, a few days before he received the package in the mail, he received a phone call from a person saying he would receive "an important package" in the mail.

31. Mr. Crittell testified that he could not tell whether the voice was that of a man or a woman and asked who it was but that the caller did not respond to his question.

32. Both Crittells testified that the receipt of the package in the mail was the first they knew of Ms. Houssien's death. Later findings note that the Crittells were continually checking on her right up to and after her death.

33. Joan Tobuk is a long time Alaskan who got to know Ms. Houssien while Ms. Houssien was recuperating in the Pioneers' Home where Ms. Tobuk worked. Ms. Tobuk—like a lot of people—became a caring friend of, and often did errands for, Ms. Houssien.

34. Ms. Tobuk would visit with Ms. Houssien and listened to her when she wanted to talk, which was often according to almost everyone who had any contact with her.

35. Ms. Houssien reported to Ms. Tobuk that she had signed blank pieces of paper and she didn't know "why they do this to me." This statement took place after Ms. Tobuk retired on August 1, 1997, and Ms. Tobuk may have thought it was contemporaneous with the experience, but Yolanda Daniels, a similar helping friend—though for hire rather than just a friend—who had met Ms. Houssien through her mother, Molena Daniels, reported that Ms. Houssien told her in 1996 of signing blank papers for a man about a "year before."

36. Rolando Ginsela, another helper to Ms. Houssien who came to help about three times a week, testified that, after Super Bowl 1995, Ms. Houssien told him that she had won the "Sweepstakes." According to Mr. Ginsela, Ms. Houssien told him that someone came to the house in a suit and tie and told her she had won a million dollars. She

signed paperwork but "they" never came back with her sweepstakes winnings.

37. Rosemarie Hidalgo testified that Ms. Houssien stated that Ed Crittell had her sign papers in blank. The court gives substantial weight to Ms. Hidalgo's testimony and rejects the testimony submitted by the Crittells trying to impeach her truthfulness.

38. During the time that Mr. Ginsela worked for Ms. Houssien (the summer of 1994 to sometime in 1995) he never became aware of a Kim, a Sue Parks, or a Suki Nakamura. Indeed, no party has produced the mysterious "Kim" who claims in a note accompanying the Will and other papers to have been Ms. Houssien's typist (Ex. 257). Nor did Ms. Houssien—in spite of sharing with Mr. Ginsela about many things including the possibility of his becoming her guardian if he did not move from Anchorage—ever mention the signing of a will on March 22, 1995. Interestingly, during the time Mr. Ginsela was with Ms. Houssien, she was very clear that she did not want Ed Crittell around her house, that she expressed a concern that Mr. Crittell would cause her to be sent to a convalescent home, and that she changed the locks to the house in order to ensure that he was kept out of her property.

39. It is during this specific time that the proponents of the March 22, 1995 Will would have the court believe that Ms. Houssien wanted Mr. Crittell to be her personal representative and wanted Mr. Crittell's wife to be the primary beneficiary of her will.

40. The Crittells agree that they were actively befriending Ms. Houssien and were in frequent contact with her from November 1993 when Elma had Thanksgiving with her and the fall of 1994 after which—due to a disagreement over the handling of tax papers—the relationship cooled and the Crittells claim to not have gone out of their way to see her except on her birthdays and holidays. The Crittells claim their only contact with Ms. Houssien in 1995 was in April when they were called by Lifeline to check on her due to an alarm. Prior to 1995, in addition to dining, socializing and helping with shopping and mail, Mr. Crittell dealt with the sewer and roto-rooter needs in December 1993, rehung some doors, and gave Ms. Houssien a

false bottom pot for a security bank. Later, in September 1994, he was too busy to assist with a roof repair she needed done.

41. But, without question, Ms. Houssien often called on Mr. Crittell for help. In November 1996, there was a problem with her door and she called Mr. Crittell to fix it. And, days after that he fixed the bath ceiling. On Thanksgiving Day 1996, Ms. Houssien called Mr. Crittell about the sewer and he arranged to have Chuck's Backhoe do a complete and major repair for $3,700.00, for which Ms. Houssien paid. In December, Ms. Houssien sent him payment of $4,000.00 for his help in getting the work done. Mr. Crittell refused the money, though he relented at her insistence and accepted $500.00 from her. In March 1997, Ms. Houssien sought help regarding her cabinets and Mr. Crittell repaired them for her. And, in April 1997, he mediated a problem she had with the Municipality of Anchorage regarding the sewer hookup. In July 1997, he replaced the security camera he had earlier installed. And, socially, he brought her flowers on her birthday in September 1997. The next and last visit he reports is Christmas Eve 1997. As earlier noted—according to the death certificate—Ms. Houssien was found dead around 5:00 p.m. on December 29, 1997.

42. Yet, Yolanda Daniels testified at length about Ms. Houssien's clear expression of her lack of trust, deep suspicion, and downright dislike of the Crittells, especially Ed. During the period Yolanda served Ms. Houssien, she was under orders from Ms. Houssien to screen calls from the Crittells and not allow them to talk to Ms. Houssien. Ms. Houssien told Yolanda Daniels she believed the Crittells stole from her, and gave a particular example of being out to dinner away from their house, and Mr. Crittell leaving the table, being gone a long time, and then, on her return to her house, noticing what she believed to be burglary. The Crittells came around to "see if she was well," which annoyed her. Sometimes they would cruise by and park out in front of her building. This, too, annoyed her. She was not happy to see the Crittells on Christmas Eve of 1997 according to Yolanda. Ms. Houssien objected to their checking on her and bringing her stuff she did not want. According to Yolanda Daniels, Mr. Crittell called her and spoke to her on December 30, 1997 asking about Violet. In fact, both Elma and Ed Crittell called asking of Ms. Houssien. Apparently, it was common for Ed Crittell to call three to four times per week during the last year and a half or so of Yolanda Daniels's service to Ms. Houssien. This belies any claim by the Crittells of being disinterested and reinforces the testimony that the Crittells had stolen a will and refused to take Ms. Houssien to her lawyer from fear that she would change her beneficiaries.

43. Laura Schell worked with Ms. Houssien at Our Lady of Compassion, now known as Providence Extended Care, sometime before August 1991. Later, in 1993, Ms. Schell worked for Providence Home Health Care and served Ms. Houssien on a routine basis until leaving in November 1993. Then in January 1995, Ms. Schell returned to Anchorage and in February 1995 started again with Providence Home Health Care and again cared for Ms. Houssien. Ms. Schell, like others who worked with Ms. Houssien, was of the opinion that Ms. Houssien was meticulous about her personal cleanliness and appearance. She considered Ms. Houssien to be decisive, strong willed, and sharp but, that due to her medication, found her to be confused at times.

Ms. Schell stated that Ms. Houssien expressed frustration with family and friends in February 1995 and spoke of planning to change her Will. Ms. Schell advised her to "think things through." The only specifics of her intentions were that she wanted the people who "cared about her most" to be taken care of in her Will, but she did not elaborate. Ms. Schell also verified Ms. Houssien's characteristic habit of wanting to immediately settle with people for what she owed them, and not be beholden to anyone. Ms. Schell reported Ms. Houssien's belief that Ed Crittell went through her personal things such as papers and documents, and reiterated her belief that Ed left dinner to burglarize her house. Mr. Crittell denies that he ever stole from Ms. Houssien, but admits to retrieving the fabricated pipe from the crawl space and discovering it had no money in it.

44. Mebelita Camero was another care giver to Ms. Houssien. She had less contact with Ms. Houssien after 1989 when responsibilities in her own family and in her business took much of her time. It was Ms. Camero who was called to help whenever Ms. Houssien had an emergency. When Ms. Houssien was taken to the hospital on December 26, 1997, just three days before being found dead at home, it was Ms. Camero who Ms. Houssien asked for at the hospital, and who came and spent the day with her.

45. Ms. Camero testified that, at the hospital, Ms. Houssien complained of many things taken from her and, in particular, was concerned that her Will had been taken. Ms. Houssien expressed a belief that Ms. Crittell may have seen her name on the Will and stolen it so that it could not be altered. This belief was supported by Ms. Houssien's statement that the Crittells refused to take her to her lawyer, she believed, because of their concern that she would change her Will. Ms. Camero was able to calm Ms. Houssien by telling her that she would take her to the attorney when she got better. These statements of the Crittells being in *a* will are reinforced by other statements by Ms. Houssien to Ms. Molena Daniels, described later in these findings.

46. Molena Daniels, Yolanda's mother, called Ms. Houssien on the Saturday after Christmas, December 27, 1997 and talked at length with her. Ms. Houssien asked Ms. Daniels to be sure to check on her. Yolanda Daniels was to work at Ms. Houssien's on the Monday following, but advised her mom that she had been unable to contact Ms. Houssien. It was Yolanda's practice to call Ms. Houssien before going over to work. Her mom told her to check with the hospitals and the Pioneers' Home, and those places were checked and she was not there. The Daniels went by the house to see if she was there, observed that no papers or meals on wheels were left outside the house, and concluded that someone was collecting these items as they were delivered and that Ms. Houssien was simply not seeing people. But, in early 1998, probably January 5, Molena Daniels received a telephone call from Ed Crittell with news that he had received a package in

the mail with the "Kim" letter and the idea that, when received, Ms. Houssien would no longer be alive.

47. Ms. Crittell testified that she last saw Ms. Houssien on December 24, 1997 when she and her husband brought her a tray of food. Her testimony was that she learned of Ms. Houssien's death on receipt of the Will and "Kim" letters, and the death was "verified" the next day.

She testified that she tried to call Ms. Houssien, went to her house, saw the door had been forced open, and saw no lights in the house. The door appeared to have been forced, but was secured. She reports that they went home and she called her sister Minnie Bayshore. Not knowing Molena Daniels' telephone number, they waited to call her at work the next business day. Ms. Crittell explained that Mr. Crittell went to Mr. Goerig first.

Ms. Houssien never mentioned to them that they were in the Will, according to Ms. Crittell. Ms. Crittell testified she had no idea that she was a beneficiary or her husband the personal representative.

48. Richard Williams, former FBI handwriting and typewriter identification expert, testified that it was his opinion that the signatures of Violet M.B. Houssien in this case are her signatures, but he doubted the authenticity of one of the signatures of Sue Parks, believing it to be a false signature made in, basically, a copying mode. Given the conflicting evidence that the signature was witnessed by Junalee Fernandez, the court rejects Mr. Williams' opinion that the Sue Parks signature is a forgery. It may well be a false signature by someone only passing as Sue Parks, but the court is satisfied the two Sue Parks signatures were made by the same person who presented evidence of identification in that name.

49. Mr. Williams testified that the Violet M.B. Houssien signatures in the "Kim" papers were all written on a line that was drawn, not typed, on the page. This fact is interesting and is further evidence that the signatures were written on the papers in blank and not after the typing occurred. Obviously, if there were going to be a line

drawn after typed material, then it would make sense to type the line onto the page. Unequivocally, however, Mr. Williams was of the opinion that the lines were made against some kind of straight edge.

50. Mr. Williams also identified the typewriter which was used to prepare the Will, the other "Kim" documents, including the codicil and a W–2 for one of Elma Crittell's employees at Ms. Crittell's store. He opined that, given the number of such typewriters in use during the 1990s, he would be willing to claim that the very same typewriter typed all the documents. In fact, using the standard that he used while with the FBI, the most he could opine with respect to the documents was that they were all prepared by the same kind of machine. It is this standard that the court adopts from Mr. Williams' testimony. But, other facts, including what the court finds to be Mr. Crittell's false testimony regarding the source of the typewriter used to type the W–2, cause the court to be convinced that the exact same typewriter was in fact used to prepare all the documents. Mr. Crittell claims the W–2 was produced on a typewriter he took from the University and later returned. The court rejects this as false testimony.

51. Where the experts differ, the court generally rejects the contradictory conclusions of the Crittells' expert, Edna Robertson, except on the issue of whether the same person signed the Sue Parks signature. To the extent Mr. Williams' testimony does not exclude that possibility but merely tends to show that someone who was not familiar with that signature was writing it, the court adopts all of his opinions except the basis for his conclusion that the very same typewriter was used (that is, that so few typewriters are used these days that, therefore, the use of a typewriter of certain general characteristics on one document justifies the conclusion the same machine was used on another).

*The language of the document—linguists and those who knew Ms. Houssien*

52. The linguistic experts presented by the parties were helpful, as were the observations of the decedent's siblings. The language used in the "Kim" papers was not the language Ms. Houssien used or would use in communicating with her siblings according to Leatrice Takeuchi, Alice Masuyama, and Elaine Sakaitani, three of Ms. Houssien's sisters. The reference to their ancestral home was completely fabricated and not the way in which the family would have referred to it, according to Ms. Takeuchi and Ms. Masuyama. Specifically, Ms. Masuyama was clear that the family would refer to the area they were from in Japan as Komamoto, not Kusha, as used in the "Kim" papers. (Ex. 254). She would not have referred to herself as Masako, according to Ms. Masuyama.

53. The language contained within the "Kim" letters generally lacks the use of articles and the proper use of the verb "to be." A reading of Ms. Houssien's correspondence from 1974 (Ex. 95 and 97) makes it evident that she effectively used both. Though no one reported a typewriter in her things, it is evident that she used one in the mid 1970s and it was not the typeface used here in the Will and "Kim" letters.

54. The content is inconsistent with the kind of language that Ms. Houssien used according to Ms. Molena Daniels who described her use of English as "very fluent." Ms. Daniels—who was clearly close to her throughout the last several years—testified that exhibits 252–255 and exhibit 258 just do not sound like Ms. Houssien. Ms. Mebelita Camero, another long time friend, said the papers did not sound like Ms. Houssien. She also found it totally out of character for her to use a form will instead of a lawyer.

55. The linguists contradict each other and the court accepts as more convincing and believable the testimony of Professor McMenamin.

56. The court finds that the Will and the accompanying "Kim" letters are a fraudulent presentation to the court and, by these findings, the Will of March 22, 1995, the accompanying writings and purported codicil are rejected as the Will of Ms. Houssien. The court finds that the person who sought presigned papers from Ms. Houssien was not from sweepstakes headquarters, but was the Crittells, either directly or indirectly through others. The papers which have appeared in

court as the "Kim" letters, exhibits 252–255 and 258 are the papers signed in blank for what purpose Ms. Houssien did not know at the time she signed them ("why [do] they do this to me") or which were for fraudulent reasons, that is, not for sweepstakes that the presenter told her they were for.

57. Additional basis for this conclusion is found in the testimony of Richard Williams that precisely the same straight edge and paper appears to have been used to produce the 1997 codicil to the Will. Of course, one would not expect the same paper or straight edge to be used two years later. But, if all the pages were pre-signed some time in January 1995, around the Super Bowl as testified to by Mr. Ginsela, that would explain that evidence. Interestingly, even the ink in the pen used at the codicil signing appears the same as that used for the allegedly earlier papers, which further suggests the simultaneous signing of the papers. The court notes a different color ink was used to sign the page which ended up being the letter to Ms. Houssien's siblings. This anomaly is unexplained, but the court continues to be convinced of the pre-signing of all "Kim" papers based on the use of the ink signature line, the use of the same straight edge, the fact the line is the same length on each page, and the placement of the text on each page, that is, the choice of single or double spacing upon the page in order to make the material appear to fit naturally.

58. Further irrationality within the documents includes Ms. Houssien's statement that she wanted to keep the matter secret until her death and that is why she uses "Kim" instead of an expensive lawyer. Of course, someone other than her had to know of a will and that included at least Kim under the internal logic of the documents. The *price* being paid to Kim is unrelated to the issue of pre-death *secrecy*. Further, there is no purpose in keeping Kim's identification and location secret *within* these letters as they would not be made known and become a risk for disclosure until after Ms. Houssien's death. These irrationalities further contribute to the court's conclusion that, at the time of the Will and various supporting documents, Ms. Houssien was not competent as is discussed below. If these documents were not fraudulent, then they would be evidence of Ms. Houssien's fragile and irrational mental state at the time of their preparation.

59. Dianne Davis testified that, while she worked for Home Health Care between 1990 and 1996, Ms. Houssien was her client for nursing services. Ms. Davis found Ms. Houssien to be fastidious as to personal hygiene and dress. According to Ms. Davis, Ms. Houssien discussed her finances and assets with her a little, including thoughts about her Will. At one time, Ms. Houssien remarked of Elma's sister, Minnie Bayshore, that "She'll never have to work again. She doesn't know it." According to Ms. Davis, Ms. Houssien later expressed some resentment toward her family but felt an obligation to leave her estate to them.

### *Ms. Houssien was not of sound mind when she signed the Will*

60. Ms. Molena Daniels testified that, at one point, Ms. Houssien indicated that Ed and Elma Crittell were in her will. Ms. Houssien also disclosed to Ms. Daniels that she had left $100,000.00 to each of her siblings. The Will propounded by the Crittells leaves $10,000.00 to each sibling.

The court finds Ms. Daniels to be a relatively good observer and reporter. Thus, this information either demonstrates that Ms. Daniels is wrong as to what she was told, or Ms. Houssien incorrectly reported her gift to her siblings. Given the evidence related to the manner in which she shared information with confidants, there is no basis to conclude she intentionally lied to Ms. Daniels, as she could have as easily said nothing. Thus, if it is not a misreport, then the Will in probate is not the one referred to in conversation with Ms. Daniels or, if it is, the Daniels' testimony demonstrates Ms. Houssien's misunderstanding of her will's practical effect.

61. Ms. Camero's testimony about the effect of Ms. Houssien's medicines on her perceptions further contribute to the court's conclusion that, though periodically lucid and "very sharp," at other times Ms. Houssien could be and was medicated out of her sensibilities and unable to know where she was or

how she got there, much less understand the nature of her wealth, or how or to whom to give it.

62. As early as the Will of October 1989, prepared by Brian Brundin, Ms. Houssien expressed the desire to leave her siblings her "love and affection, but no money or other property, since I believe none of them are in need of any property or assistance from me." And, in 1997, Ms. Houssien is reported to have told Jay Burnett, C.P.A., that she did not want to leave her property to her siblings because they had not been nice to her, and it was her desire to leave her property to people who had been nice to her.

But, evidence demonstrates that at least one of Ms. Houssien's sisters was employed well into her late 60s or early 70s. Further, some testimony suggests that the sisters lost their properties in Hawaii. This evidence is inconsistent with the idea that the siblings had no need for assistance from Ms. Houssien, and reflects inaccurate reporting of Ms. Houssien's understanding, or misunderstanding, of her siblings' reality by Ms. Houssien.

63. The court also heard the testimony of her treating doctor, Dr. Armstrong, about the potential debilitating effects of her medications and the toll of old age: arteriosclerosis and its potential effect on her exercise of judgment.

64. Psychologist Paul Berg testified, from a records exam, that it was his opinion that by March of 1995 Ms. Houssien was paranoid, delusional, addled, confused, and unstable in relationships. Due to her physical and mental condition, he considered her extremely susceptible and vulnerable to influence during March 1995. He felt the medical note related to the Crittells' criticism of her medical treatment was indicative of their power over her. That note, and reported concern on her part, was reported in the March 29, 1994 medical note earlier discussed. It was his opinion from the records that she lacked capacity to know and bequeath her bounty.

65. Psychologist Paul Craig testified and expressed the opinion that Ms. Houssien's hyper-vigilance would, if anything, cause her to protect herself from outside influence. He further considered her to be suspicious, but not paranoid and not psychotic, except possibly while delirious. He did not think she suffered from dementia. His opinions were also from records examination.

66. Osamu Matsutani, M.D., a psychiatrist, testified for the Crittells. He had treated Ms. Houssien in 1989 for thought disorder. She was very ill with the previously mentioned iliopsoas abscess and, due to the illness and necessary medications, she experienced delusional and hallucinational symptomatology. He considered it temporary, and felt she progressed well and by May of 1990 she was fine and clearly capable of making important decisions, including making a will.

67. The court adopts Dr. Matsutani's conclusions regarding her recovery from her 1989 mental problem.

68. The court also finds much of Dr. Craig's testimony helpful to understanding the limits to Dr. Berg's opinion and conclusions.

69. Stuart Hunsaker, Ms. Houssien's C.P.A. after Willett Bushnell, testified that Ms. Houssien did not inform him of a new Will in March 1995, though he was her accountant at that time. He testified she initially was high on the Crittells and then that changed when there was a falling out with them due to alleged thefts by them from her basement, including guns. Mr. Hunsaker also testified about Ms. Houssien suffering from dry mouth due to medications. Her alertness varied drastically depending on her medication throughout this time, and his experience was that about half the time she was significantly affected by her medications.

70. Given the description of Ms. Houssien as teary-eyed, etc., at the signing itself, and given the report two days earlier of the theft of $135,000, of which she later reported suspecting Mr. Crittell, the court concludes that these facts and all the medical records suggest conduct of one who is not functioning at a sufficient level to make a will. On the one hand, she reports to her doctor's office a loss of $135,000.00 cash, does not report it to the police, and then awards the bulk of her substantial wealth to a person married to the one she suspects is the thief. That behavior

**654**

is not consistent with sufficient stability and mental function to make a will.

71. Further, Ms. Houssien's subsequent report on her death bed that she believed the Crittells had stolen her Will because they might have seen their name in it, and their continuing refusal to take her to see her lawyer, reinforces the notion that Ms. Houssien may have knowingly signed the Will before the court. However, given the Crittells' involvement in the Will and Ms. Houssien's fragility, it is clear the result is not what Ms. Houssien desired. Ms. Houssien's delusion on the Crittells' possible knowledge of being in the Will, and belief they stole it, reinforces the notion that the Crittells may indeed have been involved in the preparation and signing of this Will and were aware of their beneficiary status. By being involved with Ms. Houssien both before and after the signing of March 22, 1995, they curried her favor. But, according to reliable testimony, they also prevented her from going to her lawyer out of fear of losing control, control inappropriately applied in March 1995.

72. Ms. Houssien's complaint, practically on her death bed, of the Crittells' resistance to her requests that they take her to her lawyer demonstrates not only the improper exercise of influence on Ms. Houssien, but how dependent on them and vulnerable to them she was: how much power they had over her.

. . . .

DATED at Anchorage, Alaska this 23rd day of September, 1999.

/s/ Peter A. Michalski
Peter A. Michalski
Superior Court Judge