*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Estate of: ) | |
| ) | Supreme Court No. S-18497 |
| ERNA ROUSEY. ) | |
| ) | Superior Court No. 3AN-20-01212 PR |
| ) | |
| ) | O P I N I O N |
| ) | |
| ) | No. 7770 – May 16, 2025 |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: James Rousey, Jr., pro se, Palmer. Christopher M. Brecht, Bankston Gronning Brecht P.C., Anchorage, for Lydia A. Cochran, Personal Representative of the Estate of Erna Rousey.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

CARNEY, Justice.

# I. INTRODUCTION

In the last few years of her life, Erna Rousey transferred five real properties and nearly $225,000 in cash assets to her son, James "Jimmy" Rousey, Jr. After her death, her estate sought recission of these *inter vivos* transfers on a theory of undue influence. The superior court held that the estate was entitled to the property Erna transferred to Jimmy, concluding that Jimmy maintained a confidential relationship with his mother and that the property transfers were the result of undue influence. It also awarded attorney's fees to the estate. Jimmy, now representing

himself, challenges the rescission and attorney's fee award, making several arguments on appeal. Because none of his arguments are persuasive, we affirm the recission. But we vacate and remand the enhanced attorney's fee award for reconsideration based on appropriate factors.

## II. FACTS AND PROCEEDINGS

### A. Facts

Erna Rousey was born in Germany in 1936. She met James Rousey Sr. while he was stationed there with the United States Army. The two married in 1957 and later moved to the United States. They had four children: Lydia Cochran, Diana Seekins, Mary Gordon, and Jimmy Rousey.

Erna and James were financially successful. By 2015, they had assembled a substantial property portfolio. In addition to some property outside Alaska, they owned five properties in Anchorage and Wasilla: a four-bedroom house on Maryland Avenue, a three-bedroom house on Jay Circle, a duplex on East 10th Street, a mobile home and two-bedroom house on Valley Side Circle, and a three-bedroom house on South Canter Circle. The Rouseys lived in the Canter Circle home and rented out their remaining properties. Jimmy was their property manager.

The Rouseys helped their children purchase their own properties. In 1994 the couple transferred a property in Alaska to Seekins and a house in Illinois to Gordon. In 2003 they conveyed a house in Illinois to Cochran. In each case, they entered into formalized, written purchase and sales agreements with the benefitting child. The agreements set forth the terms of repayment, including interest. Seekins and Cochran repaid their loans in full. Gordon was allowed to suspend payments while she experienced some financial difficulties; James and Erna eventually forgave the remaining mortgage and returned her payments to her.

The Rouseys helped their son as well. Jimmy and his cousin, James Horine, purchased the Valley Side property but fell behind on mortgage payments in

2000 and risked foreclosure. Erna and James paid off the remaining loan balance (about $20,000) in exchange for Jimmy and Horine transferring the property title to James.

Erna and James intended to help their children after they died, as well. In 2004 Erna executed a will dividing her estate between her four children equally if James did not survive her. She designated two of her daughters, Cochran and Gordon, to serve as her personal representatives if her husband could not.

As she aged, Erna began experiencing memory and cognition problems. She complained about her failing memory to her doctor in 2014 and was administered a screening test for cognitive impairment and dementia. The test uses a 30-point scale; a score below 21 indicates dementia. Erna scored 20. The doctor concluded she had possible mild cognitive impairment and recommended monitoring her condition. She took the test again in 2015, this time scoring 24, and told Cochran that she had been diagnosed with dementia.

In December 2015 Erna and James executed a quitclaim deed conferring Valley Side back to Jimmy "in consideration of great love."[1] Jimmy recorded the deed the same day it was executed. Erna and James also executed a quitclaim deed transferring Maryland Avenue to Jimmy for no consideration. That deed was not recorded until 2017.

In 2016 Erna executed a new will at Joint Base Elmendorf-Richardson, where she received free legal advice by virtue of James's military service. The substantive provisions of the 2016 will remained the same as the 2004 version — her estate was still to be divided equally among her children if James did not survive her. However, the 2016 will designated Jimmy as one of the personal co-representatives instead of Cochran.

---

[1] Erna was not a grantee of the original 2000 deed transferring Valley Side from Jimmy and his cousin to James.

James entered a rehabilitation center in Anchorage in May 2017 to recover from a fall, leaving Erna living alone in Wasilla. She reported to her doctor that she felt isolated because she lived so far from her husband and friends and that she had become idle since James entered the rehabilitation center. She began to rely more heavily on Jimmy, especially after a knee injury in late 2017 that her doctor reported "severe[ly] decrease[d] [her] independence." Jimmy helped her with household upkeep and yard care, drove her to appointments and social engagements, and advised her on financial and legal matters.

Erna's memory problems continued in 2017 and 2018. She asked her doctor for medication to slow her cognitive decline. She also began to rely on narcotic medication for pain from her knee injury, eventually entering a "pain contract" with her doctor to reduce her use of the painkillers.

James died on December 21, 2018. That same day, Jimmy recorded a video of Erna purporting to be a video will. In the video, Erna stated that she wanted to leave the Jay Circle and East 10th Street properties to the "two youngest," and then corrected herself, clarifying that she intended to leave them to Jimmy and Gordon[2] because they did not have as much as her other two daughters. With prompting from Jimmy, she stated that the Canter Circle property should be left to him. After Jimmy asked Erna what she wanted to do with her bank accounts, she answered that they should go with Canter Circle.

Jimmy stated in the video that they decided to record it "in case something happens to [Erna]" before she updated her will in writing. He said that Erna had an appointment with an estate planner that day, but she would be going alone because he was too exhausted to take her to another meeting. But Erna did not meet with the estate planner that day, or any other day. Nor did she draft or execute a new will.

_____

[2]     Erna's two youngest children are Jimmy and Cochran. Gordon is her second eldest.

A week after they recorded the video, Erna wrote a letter to her children informing them that it was her "wish" that Canter Circle "be turned over to" Jimmy "to do as he sees fit." She wrote: "I am alone here writing this, so no other influence surrounding me!!!"

In January 2019 Jimmy purchased a property on Vaunda Avenue from his son-in-law. In February Erna designated Jimmy as the beneficiary of her account at Alaska USA Federal Credit Union. In April she began transferring large sums of money to him. Within three weeks, he received nearly $225,000 from Erna, including the entire $172,496 balance of her savings account. By the end of the month, Erna was left with only $950. She also made Jimmy an authorized signatory to her bank accounts, which received her monthly survivor benefits from James, including his pension and social security benefits.

On May 3 Erna transferred her remaining real properties — Jay Circle, Canter Circle, and East 10th Street — to Jimmy, thereby giving him title to Jay Circle, Canter Circle, East 10th Street, Maryland Avenue, and Valley Side. Erna told her granddaughter that she transferred the properties to him so that she could qualify for Medicare or Medicaid.

Erna died in December 2019. Ten days after her death, Jimmy purchased a property on Donovan Drive.

## B.    Proceedings

In June 2020 Cochran filed a probate petition to adjudicate intestacy and appoint a personal representative and a petition for recission of the *inter vivos* property transfers to Jimmy. She sought the return of the Canter Circle, Jay Circle, East 10th Street, Maryland Avenue, and Valley Side properties to Erna's estate, alleging that Erna lacked the mental capacity to make the transfers, and that they were the product of fraud, undue influence, or coercion and therefore were void or voidable. She asked the court to impose a constructive trust over the properties and their rents, any cash or securities Jimmy received as a beneficiary or joint owner on Erna's accounts, and any portion of

the Donovan Drive property that had been purchased with Erna's funds. Cochran also argued Jimmy was ineligible to serve as personal representative because of a conflict of interest presented by these claims. The court appointed Cochran the personal representative and opened an informal intestate probate proceeding.

The petition for recission was stayed while the siblings tried to reach a settlement. After settlement negotiations failed, Jimmy filed an opposition to Cochran's petition. He maintained that the asset transfers were valid gifts, arguing that Erna had sufficient mental capacity, that he had not breached any fiduciary duties, and that the assets were not procured by undue influence. He further asserted the Maryland Avenue and Valley Side properties were conveyed to him "in consideration of repayment of loans related to the parcels."

The estate served initial discovery requests on Jimmy in August 2021. His responses were due several weeks before his deposition scheduled for September 29. After Jimmy expressed difficulty meeting that deadline, the estate agreed to delay it until mid-October and rescheduled the deposition to November. Jimmy responded to the discovery requests in October, but explicitly declined to answer the majority of the interrogatories. He objected that the estate exceeded the 30-interrgatory limit imposed by the discovery rules.[3] He argued that Interrogatory No. 3 — which asked him to identify the tenants, occupancy period, rent, and form that rent was received for each of the seven properties in dispute — actually consisted of 28 separate interrogatories.

In November 2021, Jimmy requested a protective order to postpone his deposition. The deposition had been scheduled while he was represented by a different attorney, he explained, but his new counsel was unavailable on that date. He said the estate "refused" to reschedule and asked the court to issue a protective order barring his

---

[3] Alaska R. Civ. P. 33(a) provides that "a party may serve only thirty interrogatories upon another party, including all discrete subparts" without leave by the court or written stipulation.

deposition from being held as scheduled and rescheduling it to one of several proposed dates. The estate partially opposed, explaining that it agreed with Jimmy that his deposition must be postponed but objecting to the "very limited dates" that he offered as alternatives. At the same time, it separately filed a motion to compel proper discovery responses in which it argued that Jimmy's interrogatory responses were vague, insubstantial, and incomplete.

The court granted the estate's motion to compel and denied Jimmy's protective order in part. It ordered Jimmy to supplement his responses, produce responsive documents and materials, and give Cochran as personal representative access to the properties. In addition to rejecting Jimmy's objections to the interrogatories, the court found that many of his responses "were facile, evasive and incomplete." It also awarded the estate $9,000 in attorney's fees under Alaska Civil Rule 37(a)(4)(A).[4]

About three weeks before trial, Jimmy provided the estate with a "significant amount of discovery," including the December 2018 video of Erna and financial records, both of which were subject to the court's order to compel. Jimmy claimed that he had not discovered the video until recently and that technical difficulties prevented him from providing it earlier. The attorney for the estate expressed concern that Jimmy was making "ad hoc determinations about relevance" to prevent the estate from obtaining relevant information and preparing for trial. A week later, the attorney informed the court that Jimmy had just provided "multiple boxes" and storage totes of material, again expressing concern that the last-minute and limited discovery indicated that Jimmy's disclosure was incomplete. He declined to seek a continuance but "rais[ed] a flag concerning [the] adequacy of discovery."

---

[4]     Alaska R. Civ. P. 37(a)(4)(A) authorizes an award of attorney's fees for a party that files a successful motion to compel.

Trial was held as scheduled in May 2022. Cochran testified as the personal representative of the estate. She stated that Erna had been diagnosed with dementia in 2014 or 2015 and became increasingly dependent upon Jimmy until her death. She also testified that Jimmy frequently brought up the Medicaid look-back period[5] with his parents during this time and in January 2019 suggested to Erna that she should transfer all of her assets to him so that she could qualify for Medicaid. Cochran testified that Erna would not have needed Medicaid because her children could provide long-term care and she had healthcare benefits through Medicare and TRICARE. She claimed that Erna relied on Jimmy for financial and legal advice and that Jimmy "controlled" their mother.

The estate called Erna's granddaughter and a friend of Erna's to describe Erna's capacity and her relationship with Jimmy. The friend testified that Jimmy "would normally keep [Erna] pretty much isolated from a lot of people that she knew" and "was running her life."

The estate also called Jimmy as a witness. Jimmy denied that his mother suffered from dementia. He said that she suffered only from "a little memory loss."

Jimmy testified that he purchased the Valley Side and Maryland Avenue properties from his parents. He stated that his father's purchase of the Valley Side property was intended as a loan to Jimmy so that he could buy out Horine's share of the property. Jimmy said he paid off the loan, but kept the property in James's name because Jimmy believed he would lose his Medicaid benefits if he had title to the property. Jimmy stated that he did not have a written purchase and sale agreement for the Maryland Avenue property, but that his mother kept a "handwritten tally of the payments that she received" from him, which "disappeared" once it was paid off. He

---

[5] Transfers of assets at below-market rates during the five-year period before a person applies for Medicaid may affect the person's eligibility. 7 Alaska Administrative Code (AAC) 100.510; 42 U.S.C. § 1396p(c).

admitted that he drafted the quitclaim deeds for both properties, but when questioned, did not explain why he waited two years to record the Maryland Avenue deed.

Jimmy testified that Erna conveyed her remaining assets to him in 2019 to prevent Medicaid from seizing them. He said that she also wanted him to sell the properties and divide the proceeds with Gordon so that they could "achieve a certain financial platitude equal" to Cochran and Seekins. He stated that he was unaware of Erna's 2016 will or the contents of her 2004 will and thought the "financially smart" way of avoiding expensive estate planning was "to transfer the properties right away." And he explained that Erna added him to her bank account so that he could use those funds to pay for her day-to-day needs.

Jimmy called several family and community members to describe his relationship with Erna. Gordon stated that Erna suffered from memory loss and would confuse Jimmy with her husband James. Jimmy's daughter testified that Erna trusted Jimmy "quite a bit" but she was "strong-willed" and was not controlled by Jimmy. Jimmy's former roommate testified that he did not observe any changes in Erna's personality or in Jimmy and Erna's relationship between 2015 and 2019.

Both parties presented expert witnesses. The estate called Dr. Mark Zelig as an "expert in cognitive psychology issues . . . and undue influence." Based on his experience and review of Erna's medical records, Jimmy's deposition, and the 2018 video of Erna, Dr. Zelig described how Erna's cognitive impairment, isolation, idleness, and reliance on narcotic medications made her more vulnerable to improper influence. He testified that, in his opinion, Erna was suffering from dementia in 2019 and Jimmy "took advantage of her vulnerability" and "her susceptibility" for his own benefit.

Jimmy called Dr. Georges Ghacibeh as an expert in neurology and cognitive function. Dr. Ghacibeh testified that Erna's medical records indicated "some decline in memory and cognitive function" but "she seemed quite with it."

The court issued findings of fact and conclusions of law. It held that Jimmy exerted undue influence on Erna resulting in his unjust enrichment. It found

that Jimmy maintained confidential relationships with Erna between 2014 and 2019, giving rise to the rebuttable presumption of undue influence. The court found that Jimmy had failed to prove the propriety of the transfers. While recognizing that *inter vivos* gifts from a parent to a child are presumed to be gifts, the court concluded that Jimmy's testimony "abandoned the possibility that the challenged transfers were gifts."

As a result, the superior court concluded that the estate was entitled to recission of the Maryland Avenue, East 10th Street, Jay Circle, and Canter Circle transfers and the $224,034.39 withdrawn from Erna's accounts in 2019. It also found that the estate was entitled to the Vaunda and Donovan Drive properties because they were purchased with Erna's money. The court determined that the estate was entitled to $201,700 for imputed rental income from the properties Jimmy wrongfully possessed. Finally, the court also found that the estate was the prevailing party.

After receiving the court's findings of fact and conclusions of law, the estate then filed an errata. In the errata the estate pointed out that the cash amount to which it was entitled should be reduced by the value of Donovan Drive's purchase price because Jimmy had been ordered to convey that property to the estate. Accordingly, it said the original award of $224,034.39 (the amount of cash the court found Jimmy received from Erna in April 2019) should be reduced by $145,315.95 (the purchase price of Donovan Drive) to $78,718.44. Second, the estate corrected some typographical errors, including the timeframe for which it was entitled to imputed rental income and a paragraph where the court misidentified East 10th Street as Maryland Avenue. The court issued amended findings of fact and conclusions of law incorporating the estate's corrections.

Jimmy filed a motion for reconsideration before the court issued its amended decision, which the court denied.

The estate moved for actual attorney's fees of $223,003 under Civil Rule 82(b)(3). The court found that Jimmy acted in bad faith and granted an enhanced award of $178,400.

Jimmy appeals the recission and attorney's fee award.

## III.   STANDARD OF REVIEW

"We review the superior court's evidentiary rulings for an abuse of discretion" and reverse "[e]rrors in the admission or exclusion of evidence . . . only if necessary to ensure 'substantial justice.' "[6] But we apply our independent judgment to "whether — based on the evidence presented and the scientific literature available — the technique or theory underlying the proposed expert testimony is sufficiently reliable."[7] We also "apply our independent judgment to questions of law, adopting the rule of law most persuasive in light of precedent, reason, and policy."[8]

We review the superior court's factual findings, including "[i]ssues of testamentary capacity and undue influence" for clear error.[9] "Clear error exists when we are 'left with a definite and firm conviction that the superior court has made a mistake.' "[10] "The trial court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[11]

---

[6]   *Guilford v. Weidner Inv. Servs., Inc.*, 522 P.3d 1085, 1093 (Alaska 2023) (quoting *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016)).

[7]   *State v. Sharpe*, 435 P.3d 887, 900 (Alaska 2019).

[8]   *Kuretich v. Alaska Tr., LLC*, 287 P.3d 87, 88 (Alaska 2012) (quoting *Jacob v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 177 P.3d 1181, 1184 (Alaska 2008)).

[9]   *Crittell v. Bingo*, 36 P.3d 634, 638 (Alaska 2001).

[10]   *Wiegers v. Richards-Wiegers*, 420 P.3d 1180, 1182 (Alaska 2018) (quoting *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009)).

[11]   *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)).

We "review an award of attorney's fees under Civil Rule 82, including an award of enhanced attorney's fees, for abuse of discretion."[12] An abuse of discretion exists "[only] if an award is 'arbitrary, capricious, manifestly unreasonable, or the result of an improper motive.' "[13] "But because an enhanced fee award . . . 'calls into question a party's litigation conduct and the potential merits of the party's underlying motions, we assess de novo the legal and factual viability of the party's motions and review relevant findings of fact for clear error.' "[14]

## IV.    DISCUSSION

### A.    The Superior Court Was Not Required To Hold A *Daubert*/*Coon* Hearing.

Jimmy first argues that the superior court erred by failing to conduct a *Daubert*/*Coon* hearing on its own motion before admitting Dr. Zelig's expert testimony. Under the *Daubert*/*Coon* standard, novel scientific testimony can be admitted only if it is scientifically valid — i.e., "derived by the scientific method" and "supported by appropriate validation" — and its methodology can be properly applied to the facts in the case.[15] We adopted the *Daubert* standard in *State v. Coon*.[16]

The estate proposed Dr. Zelig as an "expert in cognitive psychology issues . . . and undue influence." Jimmy did not ask the court to conduct a *Daubert*/*Coon* hearing. In fact, he accepted Dr. Zelig as a qualified expert. Because he did not object to Dr. Zelig's expert testimony, he must prove that the superior court plainly erred —

---

[12]     *Sykes v. Lawless*, 474 P.3d 636, 646-47 (Alaska 2020) (quoting *Herring v. Herring*, 373 P.3d 521, 528 (Alaska 2016)).

[13]     *Id.* at 647 (alteration in original) (quoting *Keenan v. Meyer*, 424 P.3d 351, 356 (Alaska 2018)).

[14]     *Id.* (cleaned up) (quoting *Herring*, 373 P.3d at 528).

[15]     *State v. Sharpe*, 435 P.3d 887, 893 (Alaska 2019) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)).

[16]     974 P.2d 386, 392-98 (Alaska 1999).

that its failure to conduct a *Daubert/Coon* analysis "involves an 'obvious mistake' that is 'obviously prejudicial.' "[17]

The court did not plainly err. A *Daubert/Coon* analysis is not necessary "when an area of expertise is well-known and has been fully considered by the courts."[18] In *Samaniego v. City of Kodiak* we affirmed the admissibility of psychiatric testimony without a *Daubert/Coon* hearing when it was based on a typical medical examination.[19] We noted that we have "repeatedly recognized the validity of . . . forensic psychological and psychiatric exams in civil and criminal contexts."[20]

Dr. Zelig is a forensic psychologist. The court accepted him without objection as an expert in "cognitive psychology issues relevant to this case and undue influence." He offered his opinion based on Erna's medical records. His testimony about Erna's capacity and vulnerability to undue influence, like the testimony in *Samaniego*, was in an area of expertise previously considered by the courts and therefore not subject to a *Daubert/Coon* analysis.[21]

---

[17] *In re Hospitalization of Carter K.*, 557 P.3d 755, 761 (Alaska 2024) (quoting *In re Hospitalization of Tonja P.*, 524 P.3d 795, 800 (Alaska 2023)); *see also* Alaska R. Evid. 103(d).

[18] *Coon*, 974 P.2d at 398; *see also Samaniego v. City of Kodiak*, 80 P.3d 216, 220 (Alaska 2003).

[19] 80 P.3d at 220.

[20] *Id.* (citing *Fardig v. Fardig*, 56 P.3d 9, 14 (Alaska 2002); *J.S. v. State*, 50 P.3d 388, 392 (Alaska 2002); *In re S.H.*, 987 P.2d 735, 740-41 (Alaska 1999); *Nelson v. State*, 874 P.2d 298, 303 (Alaska App. 1994)).

[21] *See id.*; *see also J.S.*, 50 P.3d at 395 (crediting expert testimony by forensic psychologist); *Bateman v. State*, 125 So. 3d 616, 625-27 (Miss. 2013) (upholding admissibility of testimony given by expert qualified in forensic psychology following *Daubert* analysis); *State v. Brown*, 347 So. 3d 745, 829 (La. 2022) (crediting reliability and relevance of forensic psychiatry expert testimony); *In re Est. of Dokken*, 604 N.W.2d 487, 497-500 (S.D. 2000) (upholding admissibility of forensic psychiatrist's expert testimony regarding testator's capacity); *cf.* AS 12.47.070(a)

**B.    The Court Did Not Err by Concluding That Jimmy Exercised Undue Influence.**

Jimmy argues that he did not exert undue influence over Erna. He contends that the court erred by applying the law of undue influence for testamentary gifts instead of *inter vivos* gifts and that it failed to recognize the presumption that conveyances from parents to children are gifts. He also argues that the court erred by finding he shared a confidential relationship with Erna in 2015 and that he obtained the properties by undue influence.

We begin by reviewing the relevant legal framework and then address each argument in turn. We conclude that the court properly applied the law of undue influence and that the evidence supports its findings with respect to the transferred property.

**1.    Legal framework.**

Transfers of property from a parent to child are presumptively gifts.[22] A gift, however, may be void if obtained by undue influence.[23] We use a subjective standard to determine whether the influence exerted on the donor was undue, considering the donor's "physical and mental condition, the person by whom [the influence] was exerted, the time and place and all the surrounding circumstances."[24] The "party challenging the validity of a gift under a theory of undue influence must produce proof of 'coercion or duress which would act as a dominating power' " over the donor.[25]

---

(requiring appointment of two qualified psychiatrists or forensic psychologists to examine and report on mental condition of any defendant relying on insanity defense).

[22]    *Ware v. Ware*, 161 P.3d 1188, 1192-93 (Alaska 2007).

[23]    *Id.* at 1193.

[24]    *Id.* (quoting *Crittell v. Bingo*, 36 P.3d 634, 639 (Alaska 2001)).

[25]    *Id.* (quoting *Crittell*, 36 P.3d at 639).

Ordinarily the party challenging a transfer must prove undue influence by clear and convincing evidence.[26]  However, a presumption of undue influence arises when the beneficiary shares a confidential relationship with the donor.[27]  "A confidential relationship does not necessarily arise from a family relationship."[28]  Rather, the inquiry is whether "one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the [other's] interests."[29]  We have recognized such relationships between business partners, lawyers and their clients, and relationships involving trusts and guardianships.[30]

With these principles in mind, we consider Jimmy's arguments.

### 2. The law of undue influence applies equally to testamentary and *inter vivos* gifts.

Jimmy first argues that the money and property Erna transferred to him were *inter vivos* gifts, not testamentary.  He contends that the court's reliance on *Paskvan v. Mesich*[31] was improper because the estate offered no evidence that he was present when Erna drafted her wills or the handwritten statement he claims she intended as a codicil.  The estate responds that the court applied the correct legal standard.

In *Paskvan* we held that a presumption of undue influence arises in the testamentary context when the principal or sole beneficiary under a will had a

---

[26] *Purcella v. Olive Kathryn Purcella Tr.*, 325 P.3d 987, 994 (Alaska 2014).

[27] *Ware*, 161 P.3d at 1194.

[28] *Purcella*, 325 P.3d at 994; *accord Ware*, 161 P.3d at 1194-95.

[29] *Ware*, 161 P.3d at 1194 (quoting *Paskvan v. Mesich*, 455 P.2d 229, 232 (Alaska 1969)).

[30] *Id.* (citing *Paskvan*, 455 P.2d at 232 (partners or co-owners); *Cummings v. Sea Lion Corp.*, 924 P.2d 1011, 1021 (Alaska 1996) (lawyers and clients); *Alaska State Emps. Assoc. v. Alaska Pub. Emps. Assoc.*, 825 P.2d 451, 459 (Alaska 1991) (trusts and guardianships)).

[31] 455 P.2d 229 (Alaska 1969).

confidential relationship with the testator and participated in the drafting of the will.[32] We later extended *Paskvan* to *inter vivos* transfers of property in *Ware v. Ware*, "see[ing] no reason not to apply [the same] reasoning to an *inter vivos* gift."[33]  We stated that "if [the donor and recipient] shared a confidential relationship, the transfer of property would create a rebuttable presumption of undue influence."[34]

Jimmy's argument overlooks *Ware*.  The transfers occurred while Erna was alive, so there is "no reason not to apply" the same reasoning from *Paskvan*.[35] Because the superior court concluded that Jimmy had "multiple overlapping confidential relationships" with Erna, the property transfers created a rebuttable presumption of undue influence.[36]

Jimmy further argues that it does not matter if he maintained a confidential relationship with Erna because she did not benefit from the relationship.  His argument is based on an understandable misreading of *Ware*, which stated that the presumption of undue influence arises "when a principal in a confidential relationship benefits from that relationship."[37]  Jimmy interprets this to mean the presumption exists when the principal — here Erna — benefits.  In reality the inverse should be and is true.  But our inartful excerpt from *Paskvan* in *Ware* has led to a misunderstanding about how the presumption works.[38]  We take this opportunity to clarify any misunderstanding:  the presumption of undue influence arises when the fiduciary in a confidential relationship

---

[32]     *Id.* at 233.

[33]     *Ware*, 161 P.3d at 1193.

[34]     *Id.* at 1194.

[35]     *Id*. at 1193.

[36]     *Id.* at 1193-94.

[37]     *Id.*

[38]     *See* Ian W. Fraser, Ware v. Ware *and the Presumption of Undue Influence in Confidential Relationships*, 38 ALASKA L. REV. 341 (2021) (describing misunderstanding).

receives a benefit from the principal.[39]  Because the superior court concluded that Erna had a confidential relationship with Jimmy that conferred a benefit upon him, it did not err by applying the presumption of undue influence.

> **3.     Although they are presumed to be gifts, *inter vivos* transfers from parent to child may be void due to undue influence.**

Jimmy's second argument is that the court erred by ignoring the presumption that *inter vivos* transfers of property from parents to children are gifts.  He contends that he did not "abandon[] the gift presumption" by his testimony as the court found, and therefore it was error to shift the burden to him to prove that the transfers were intended as gifts.

The gift presumption is just that — a presumption.  It is an inference assumed to be true unless it is overcome by evidence to the contrary.[40]  And while "[*i*]nter vivos transfers of property from parents to children are presumptively gifts,"[41] we recognized in *Ware* that "[a] gift from parent to child may be void if obtained by improper means or undue influence."[42]  When a parent transfers property to a child, the party challenging the transfer bears the burden of proving that the recipient unduly influenced the parent to make the transfer.[43]  The burden then shifts to the recipient to present evidence showing that the parent was not unduly influenced.[44]

---

[39]     *Ware*, 161 P.3d at 1194-95; *see also Purcella v. Olive Purcella Kathryn Tr.*, 325 P.3d 987, 994 (Alaska 2014).

[40]     *Presumption*, BLACK'S LAW DICTIONARY (12th ed. 2024); Alaska R. Evid. 301(a); *see also Osterkamp v. Stiles*, 235 P.3d 178, 191 (Alaska 2010) (holding gift presumption rebutted by "weightier evidence" that funds were intended as loan).

[41]     *Ware*, 161 P.3d at 1192.

[42]     *Id.* at 1193.

[43]     *See id*.

[44]     *See In re Est. of McCoy*, 844 P.2d 1131, 1135 (Alaska 1993).

The superior court found that the estate satisfied its burden. It held that the estate presented clear and convincing evidence that Jimmy obtained Erna's property by undue influence. The burden then shifted to Jimmy to present evidence that the transfers were, in fact, intended as gifts. The superior court concluded that he had failed to do so. The court did not ignore the gift presumption; it determined that the estate's evidence overcame it.

The superior court found that "none of the challenged transfers were gifts." Though Jimmy's trial brief argued that the transfers were gifts, at trial he testified that he earned or paid for all of the properties Erna transferred to him. He also claimed interchangeably that the April 2019 cash and real property transfers were intended to shield Erna's assets from supposed Medicaid seizure or to operate as a living trust for Erna's care or a testamentary trust for Jimmy's and Gordon's benefit. Based on this conflicting evidence, the court did not clearly err by concluding that the transfers were not gifts.[45]

### 4. The court did not err by finding a confidential relationship existed between Jimmy and Erna.

Jimmy's third argument is that the superior court erred by concluding he had a confidential relationship with Erna since 2015. The estate responds that the court's factual findings show that Erna placed special trust and confidence in Jimmy to establish a confidential relationship.

A confidential relationship arises "when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence."[46] It may exist

---

[45] *See Osterkamp*, 235 P.3d at 191.

[46] *Ware*, 161 P.3d at 1194 (quoting *Paskvan v. Mesich*, 455 P.3d 229, 232 (Alaska 1969)); *see also Fiduciary Relationship*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining confidential relationship as "[a] relationship in which one person is

as a matter of law, such as "between business partners or co-owners, between professionals such as lawyers and their clients, and in relationships involving trusts and guardianships,"[47] or as a matter of fact.[48] We have stated that a familial relationship does not necessarily give rise to a confidential relationship; whether a confidential relationship exists depends on whether "one party places confidence in the other with a resulting superiority and influence on the other side."[49]

Substantial evidence supports the court's conclusion that Jimmy maintained "multiple overlapping confidential relationships" with Erna between 2014 and 2019. The record shows that Jimmy did more than just help Erna with ordinary activities; she depended on his advice regarding legal, financial, and medical decisions. Based on his advice, she divested herself of all of her assets to qualify for Medicaid, an insurance coverage that she did not even need because she was already covered by two other health insurers. She made him a signatory to her bank account, a personal representative in her will, and an alternative agent for her power of attorney for health care. Dr. Zelig testified that Erna explicitly trusted Jimmy and he exerted financial control over her after James's death.

Jimmy argues that the evidence presented at trial shows that he was his parent's employee, not their partner, in managing their properties. Therefore, he argues,

---

under a duty to act for the benefit of another on matters within the scope of the relationship").

[47] *Ware*, 161 P.3d at 1194 (quoting *Munn v. Thorton*, 956 P.2d 1213, 1220 (Alaska 1998)).

[48] *See Paskvan*, 455 P.2d at 232 (analyzing facts of business relationship); *Purcella v. Olive Kathryn Purcella Tr.*, 325 P.3d 987, 994 (Alaska 2014) (considering facts of familial relationship to determine whether confidential relationship existed).

[49] *Ware*, 161 P.3d at 1195 (quoting *Francois v. Francois*, 599 F.2d 1286, 1292 (3d Cir. 1979)); *see also Purcella*, 325 P.3d at 994.

the court erred by finding that the Maryland Avenue transfer was the product of undue influence.

His trial testimony indicates otherwise. Jimmy testified that he found the Maryland Avenue property and negotiated its purchase. He claimed that he asked his parents to help by co-signing a loan, but instead they insisted on purchasing it outright and having him pay them back. Unlike his sisters, however, Jimmy never entered into a purchase and sales agreement for the property with his parents. He testified his debt was repaid by the rent and management fees collected from the property, which his mother tracked in a handwritten tally.[50] Yet Erna continued to pay electric bills and property taxes for Maryland Avenue even after Jimmy took title.

Jimmy's involvement in the other properties was similarly extensive. He found properties for Erna and James to purchase even though they were not looking for rental properties. Jimmy also remodeled several properties according to "100 percent me and my vision" for them. While his parents paid for the materials for repairs and remodels, Jimmy supplied the labor and said he was not compensated for his work.

Jimmy's role as property manager thus resembles a joint venture more than an employer-employee relationship.[51] The years-long relationship, without any written agreements or direct compensation with his parents, demonstrates that they placed in him "a level of trust beyond that in ordinary business relationships."[52] Based

---

[50] He said the handwritten tally "disappeared" once he repaid his parents.

[51] A joint venture is "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge." *Gavora, Inc. v. City of Fairbanks*, 502 P.3d 410, 415 (Alaska 2021) (quoting *N. Lights Motel, Inc. v. Sweaney*, 561 P.2d 1176, 1187 (Alaska 1977)).

[52] *Williams v. Baker*, 446 P.3d 336, 340 (Alaska 2019) (quoting *Munn*, 956 P.2d at 1220).

on this "special confidence," we cannot say the superior court clearly erred when it concluded that Jimmy shared a confidential relationship with Erna since at least 2014.

### 5. The superior court did not err by finding the property transfers were the result of undue influence.

Jimmy argues that the court erred by finding that he unduly influenced Erna because it did not find that coercion or duress acted as a dominating power in her mind. He also reasons that the evidence would not support such a finding, especially for the 2015 property transfer. The estate responds that Jimmy failed to provide credible evidence to rebut the presumption of undue influence triggered by his confidential relationship with Erna.

A grantor is unduly influenced when another person exercises such control over her that she "is unable to exercise 'free and deliberate judgment' or is coerced 'into doing something that would not have been done absent the influence.' "[53] To prove that a property transfer was the product of undue influence, the party challenging the transfer must show by clear and convincing evidence that: "(1) the target of the alleged undue influence was susceptible to influence; (2) another person had the opportunity to exert influence; (3) improper influence was, in fact, exerted; and (4) the [transfer] shows signs of the improper influence."[54] However, when the recipient of the property is in a confidential relationship with the grantor, the transfer of property itself creates a rebuttable presumption of undue influence.[55] As a result, the burden shifts to the

---

[53] *Purcella*, 325 P.3d at 993-94 (quoting *In re S.K.L.H.*, 204 P.3d 320, 328 n.41 (Alaska 2009)).

[54] *Id.* at 994; *see also Ware*, 161 P.3d at 1193 ("When examining the relationship between parent and child for proof of undue influence, we will consider 'the effect of the influence which was, in fact, exerted upon the mind of the [donor], considering his physical and mental condition, the person by whom it was exerted, the time and place and all the surrounding circumstances.' " (alteration in original) (quoting *Crittell v. Bingo*, 36 P.3d 634, 639 (Alaska 2001))).

[55] *Ware*, 161 P.3d at 1194.

recipient to show that he did not take advantage of the confidential relationship to influence the grantor to transfer property to him.[56]

The court's finding that Jimmy exercised undue influence over Erna is supported by the record. In light of its finding that Jimmy maintained a confidential relationship with Erna and the rebuttable presumption of undue influence, the court noted that the estate needed only to prove by a preponderance of the evidence that the transfers were the result of undue influence. The court nevertheless found that the estate proved by clear and convincing evidence that Erna's real property transfers to Jimmy were the result of undue influence.

Witness testimony, including Dr. Zelig's, established that Erna was susceptible to undue influence because of her diminished mental capacity, isolation, confusion, and reliance on Jimmy. The evidence also demonstrated that Jimmy had the opportunity to exert influence over her through the trust and reliance she placed in him and his access to her bank accounts. And testimony, including his own, demonstrated that Jimmy took advantage of Erna's confusion about Medicaid to convince her to transfer her assets to him.

The evidence also revealed the transfers appeared to have been caused by Jimmy's improper influence. Jimmy admitted that he drafted the deeds transferring Maryland Avenue, East 10th Street, Jay Circle, and Canter Circle to him, only submitting them to Erna for her signature. Erna signed the Maryland Avenue deed on the same day she signed the Valley Side deed — a property in which she did not have any interest — which suggests that she did not understand the nature or extent of her property. Jimmy's explanation that she conveyed the property to him to qualify for Medicaid is unpersuasive in light of other evidence that Erna already had health insurance and that, even if the lookback period was a concern, she would have needed

---

[56] *Id.*; *see also Paskvan v. Mesich*, 455 P.2d 229, 233 (Alaska 1969).

to wait five years to apply to Medicaid. Jimmy testified that the transfer of the Maryland Avenue property was proper because it had always been his. But the court gave "minimal weight" to his testimony and we give "particular deference" to findings "based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[57]

The superior court properly considered the relevant undue influence factors and its findings are supported by the record. It did not err by finding that Jimmy had a confidential relationship with Erna and exercised undue influence over her.

### C. The Various Claimed Factual Errors Are Moot.

Jimmy argues that the superior court erred in its first findings of fact and conclusions of law by misidentifying the date that the Maryland Avenue property was conveyed; by ordering him to return Donovan Drive, Vaunda, and the cash value of the April 2019 bank transfers; and by accepting the estate's proposed findings of fact and conclusions of law with errors. The estate pointed out these clerical errors and miscalculations in its errata; the superior court made the corrections in its amended findings of fact and conclusions of law. The amended findings of fact and conclusions of law superseded and replaced the initial findings of fact and conclusions of law *nunc pro tunc*. Jimmy's claims regarding these factual errors are therefore moot.[58]

### D. The Court Did Not Err By Requiring Jimmy To Reimburse The Estate For Collected Rents.

The superior court found that Jimmy would be unjustly enriched if he were allowed to keep any rents received from the transferred properties. Based on the

---

[57] *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)).

[58] *In re Hospitalization of Jacob S.*, 384 P.3d 758, 770 (Alaska 2016) ("[A] claim is moot if it is no longer a present, live controversy, and the party bringing the action would not be entitled to relief, even if it prevails." (alteration in original) (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 839 (Alaska 2014))).

fiduciary duty he owed as the constructive trustee of the estate's assets to provide for the highest and best use of the property, it concluded that he was responsible for the rents "that were gained, or were available" for the properties he wrongfully possessed. Specifically, the court ordered him to reimburse the estate for imputed rental income from the Maryland Avenue, East 10th Street, Jay Circle, and Donovan Drive properties. Jimmy argues that it was error to order reimbursement for periods when the properties were unrentable, contending their unrentable states were caused by Erna's direct decisions.

The record does not support Jimmy's argument. The court found that he was responsible for the imputed rental income for East 10th Street, Jay Circle, and Donovan Drive from the date he took title to the properties and for rent from Maryland Avenue from the date James died because Erna's rights in that property vested under her right of survivorship upon James's death. It relied on Jimmy's testimony for the properties' current rental incomes. While any imputation of rental income is somewhat speculative, the superior court reasonably relied on the properties' actual rental income as provided by Jimmy to calculate their estimated income.[59] Jimmy did not present evidence that the properties were unrentable at any time due to Erna's decisions. To the contrary, he indicated that he was the final decision-maker on significant repairs after he took possession of the properties. On these facts, we are not left with a definite and firm conviction that the superior court made a mistake in calculating the properties' imputed rental income.[60]

However, it was error not to account for the assets held by Gordon that are subject to the constructive trust. Jimmy gave $50,000 to Gordon from Erna's

---

[59] *See Sawicki v. Haxby*, 186 P.3d 546, 550-51 (Alaska 2008) (affirming imputed income based on recent actual wages).

[60] *See Rohde v. Rohde*, 507 P.3d 986, 992 (Alaska 2022) ("We review . . . the amount of income imputed for clear error.").

monetary transfers. The constructive trust therefore includes those funds, even though they are held by Gordon. Jimmy is entitled to a credit for any amount directly returned to the estate or considered an advancement from the estate as part of the distribution of assets under Erna's 2016 will.

### E. The Court Properly Considered Erna's Intent.

Jimmy argues that the court did not consider his parents' intent with respect to the *inter vivos* property transfers or Erna's intent regarding how the properties in her estate were to be managed after her death. The estate responds that the court appropriately considered the evidence presented. We agree with the estate.

The court considered Erna's 2004 and 2016 wills, the 2018 handwritten statement, the December 2018 video, and various testimony to determine her testamentary intent. It accepted the handwritten codicil as evidence of her donative intent but gave it "minimal weight," concluding that "the document itself [was] a product of [Jimmy's undue] influence." Similarly, the court accepted the December 2018 video as evidence of Erna's donative intent, but found that it presented "additional cause for concern" as it demonstrated "Erna's susceptibility to influence or suggestion from or by Jimmy." The court considered all of the evidence of Erna's intent presented at trial. It did not err by affording minimal weight to evidence that it concluded was the product of undue influence.[61]

Jimmy also argues that the trial court erred by not first determining if Erna might have destroyed her original 2004 will after executing the 2016 will. Whether Erna destroyed her original copy of her 2004 will is irrelevant because Erna's 2016 will expressly revoked all prior wills and codicils. In addition, neither party challenges the validity of the 2016 will; the existence of the original 2004 will is immaterial.

---

[61] *See Crittell v. Bingo*, 36 P.3d 634, 642 (Alaska 2001) (invalidating will executed under undue influence).

**F.  The Attorney's Fee Award Must Be Remanded And Reconsidered.**

Civil Rule 82(b) establishes a presumptive schedule for the award of attorney's fees.[62]  A court may award fees greater than the amount prescribed if it determines that an enhancement is warranted after consideration of various factors.[63] But an award of 80% of full fees is a substantially full award and may be granted only upon a finding that the non-prevailing party engaged in bad faith or vexatious conduct.[64] That conduct must occur "*during the litigation*, not during the underlying transaction that is the subject of the litigation."[65]

The superior court granted the estate an enhanced award of $178,400, or 80% of its actual attorney's fees.  It concluded that the enhancement was warranted in light of Jimmy's bad faith "in terms of the fraud he perpetrated against Erna . . . , his decision to oppose the relief requested in the Petition, and his conduct during the course of litigation."  The court also observed that "[t]he level of fraud and deceit perpetrated by [Jimmy], and the sheer breadth of his dishonesty, was extraordinary" and required "extraordinary levels of legal work, perseverance, and thoroughness" to "[d]evelop[] and present[] the evidence."

Jimmy argues that the superior court abused its discretion "by punishing" him with "excessive attorney's fees."  The estate responds that the enhanced award was appropriate in light of Jimmy's litigation conduct.  It points to his evasive and "utterly confounding" testimony, inadequate discovery disclosures, and subsequent attempt to collaterally attack the court's judgment by filing a separate action as examples of his bad faith.

---

[62]  Alaska R. Civ. P. 82(b)(1)-(2).

[63]  Alaska R. Civ. P. 82(b)(3).

[64]  *Marathon Oil Co. v. ARCO Alaska, Inc.*, 972 P.2d 595, 604-05 (Alaska 1999).

[65]  *Cole v. Bartels*, 4 P.3d 956, 961 n.24 (Alaska 2000) (emphasis in original).

Bad faith for the purpose of determining attorney's fees requires "[d]ishonesty of belief or purpose."[66] And the effect of that dishonesty "must be such that the parties are prevented from litigating the action on an equal plane"; merely evasive responses or discovery delays "do not, in themselves, constitute bad faith or vexatious conduct."[67]

While the superior court could have been more detailed in its findings, there is sufficient evidence that Jimmy acted in bad faith during the course of litigation. The record reveals a pattern of obstruction and delay. After multiple extensions, missed deadlines, and repeated admonitions to comply with discovery obligations, Jimmy furnished significant disclosures going "directly to the heart of the matter" just weeks before trial. He turned over multiple boxes of Erna's documents and personal belongings less than two weeks before trial began. According to counsel for the estate, several boxes contained irrelevant and non-responsive materials, including trash and rat droppings. Jimmy did not provide the original copy of Erna's handwritten letter that he asserted was a codicil until halfway through trial.

These late and incomplete disclosures affected the estate's ability to prepare a defense to Jimmy's claims, preventing the parties from litigating on an equal plane and substantially increasing the estate's attorney's fees. We therefore are not persuaded that the court clearly erred by finding that Jimmy acted in bad faith.[68]

---

[66]     *Bragg v. Teslow*, 533 P.3d 533, 539 (Alaska 2023) (alteration in original) (quoting *Johnson v. Johnson*, 239 P.3d 393, 400 (Alaska 2010)).

[67]     *Gallant v. Gallant*, 945 P.2d 795, 803 (Alaska 1997) (quoting *Kowalski v. Kowalski*, 806 P.3d 1368, 1373 (Alaska 1991)).

[68]     *See Mellard v. Mellard*, 168 P.3d 483, 488 (Alaska 2007) (affirming enhanced award based on defendant's refusal to engage in discovery); *Khalsa v. Chose*, 261 P.3d 367, 377 (Alaska 2011) (observing in dicta that enhanced award for unreasonable nondisclosure was not abuse of discretion).

However, to the extent that the court may have relied on Jimmy's bad faith in convincing Erna to transfer assets to him, that reliance was error. "[T]he court may not hold actions before litigation started . . . against the losing party."[69] And the order does not explain why the court found that Jimmy opposed the petition in bad faith. Unsuccessful claims, defenses, and motions do not, on their own, justify enhanced fees.[70] Instead, the losing party's claims must be "collectively or individually so lacking in merit" as to imply bad faith.[71] Without further explanation, we are not convinced that Jimmy's opposition was so baseless and unsupported to suggest bad faith. In light of our concerns about two of the three bases on which the court relied for the enhancement, we vacate the attorney's fee award and remand to the court for reconsideration based on appropriate factors.[72]

## V. CONCLUSION

We VACATE and REMAND the superior court's final judgment with the instruction to credit Jimmy the $50,000 he gave to Gordon, and credit for any amount directly returned to the estate or any advancement from the estate as part of the distribution of assets under Erna's 2016 will. We also VACATE the attorney's fee

---

[69] *Riddle v. Lanser*, 421 P.3d 35, 50 (Alaska 2018); *cf. Sykes v. Lawless*, 474 P.3d 636, 647 (Alaska 2020) (affirming enhanced award when losing party brought suit as vehicle to advance underlying fraud); *Crittell v. Bingo*, 83 P.3d 532, 537-38 (Alaska 2004) (same).

[70] *Riddle*, 421 P.3d at 49 ("A party need not prevail on his claims or defenses for them to be reasonable.").

[71] *Bragg*, 533 P.3d at 540 (quoting *Johnson*, 239 P.3d at 401).

[72] We note that the court properly excluded costs and fees related to the discovery violations for which Jimmy had already been sanctioned, *see Riddle*, 421 P.3d at 50 n.44, and that it is not foreclosed from awarding enhanced fees on remand, *see Johnson*, 239 P.3d at 404.

award and REMAND for further consideration consistent with this opinion. We otherwise AFFIRM the superior court's rulings.[73]

---

[73] Jimmy also argues that he should be reimbursed by the estate for his time improving the rental properties and his costs associated with such improvements. He first raised this argument in his motion for reconsideration. Because he did not timely present this claim, it is waived. *See Fischer v. Kenai Peninsula Borough Sch. Dist.*, 548 P.3d 1086, 1092 (Alaska 2024).